Marvin POWELL, Brian Holloway, Michael Kenn, Michael Davis, James Lofton, Michael Luckhurst, Dan Marino, George Martin, Steve Jordan and the National Football League Players Association on behalf of themselves and all class members, Plaintiffs,

v.

NATIONAL FOOTBALL LEAGUE, et al., Defendants.

Civ. No. 4–87–917.

United States District Court,
D. Minnesota,
Fourth Division.

Jan. 29, 1988.

Edward M. Glennon, Carol T. Rieger, J. Michael Dady, Luke H. Terhaar and Lind-quist & Vennum, Minneapolis, Minn., for plaintiffs.

Laura Besvinick, Bruce W. Greer and Greer, Homer, Cope & Bonner, Miami, Fla., for plaintiff-intervenor.

Paul J. Tagliabue, John H. Schafer, Herbert Dym, Lyle Jeffrey Pash and Covington & Burling, Washington, D.C., for defendants.

## MEMORANDUM AND OPINION

DOTY, District Judge.

Plaintiffs in this action are the National Football League Players Association ("NFLPA") and several professional football players who play for various clubs in the National Football League ("NFL"). On October 15, 1987, plaintiffs commenced this lawsuit against the NFL and its member organizations pursuant to sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to enjoin and otherwise redress alleged violations of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*

The case is now before the Court on plaintiffs' motions for partial summary judgment and for a preliminary injunction, and on defendants' cross-motion for summary judgment. Specifically, plaintiffs request partial summary judgment declaring that the NFL defendants have wilfully acquired or maintained monopoly power in the market for major league professional football in the United States. Plaintiffs also seek to enjoin defendants from implementing or continuing a system of alleged player restraints known as the Right of First Refusal/Compensation system and the NFL Players Contract (referred to collectively as the "player restraints").[1] Defendants' cross-motion seeks summary judgment declaring that the challenged restraints are insulated from antitrust scrutiny by operation of the nonstatutory labor exemption to the antitrust laws.

---

1. Plaintiffs also contend that the NFL College Draft violates the antitrust laws, but only the Right of First Refusal/Compensation system and the NFL Player Contract are the subjects of this motion.

## FACTUAL BACKGROUND

The restraints which are the subject of this motion are the Right of First Refusal/Compensation system and the NFL Player Contract. Plaintiffs allege that since the League's inception, defendants have continuously imposed these and other anti-competitive player restraints in order to depress player salaries and restrict player movement among the NFL clubs.

### NFL Player Contract [2]

Since at least the early 1950's, defendants have required all NFL players to sign a standardized contract, essentially uniform in all respects except for compensation and duration, as a condition to becoming or remaining employed in the NFL. The standard form utilized by the NFL defendants from the early 1950's through approximately 1976 was known as the "Standard Player Contract." The NFL defendants changed the standard form contract in 1976 and implemented a form contract known as the "NFL Player Contract," which has remained unchanged from 1977 to date. Plaintiffs allege that the NFL Player Contract contains many restrictive provisions including, among other things, a requirement that the player abide by various rules and regulations unilaterally adopted by the NFL. These rules and regulations include the so-called "waiver system" through which players allegedly are denied free agency in the event of their discharge by the club for which they are playing unless and until all 28 NFL clubs sequentially "waive" their self-conferred rights to employ the player under the terms of the player's existing contract. The player must accept the terms of the standardized contract or he may not play football. Plaintiffs contend that the NFL Player Contract violates the antitrust laws.

### Right of First Refusal/Compensation System

Under the Right of First Refusal/Compensation system, every NFL club retains rights to "its players" even though, in the case of veteran free agents, contractual rights to a player no longer exist. When a veteran player's contract has expired and a competing NFL club makes an offer to that player, the player's old team may keep the player simply by matching the competing offer; the player's old club therefore is said to have a "right of first refusal" as to the player's services. If the competing offer is large enough, and the club to which the player was previously under contract does not choose to match a competing offer, the old club will receive draft choice "compensation" which may be extremely costly to the acquiring club. Plaintiffs allege that in addition to restraining player movement, this system has effectively eliminated competition among NFL clubs for player services.

The current Right of First Refusal/Compensation system, though substantially modified, finds its source in the old "Rozelle Rule." [3] The Rozelle Rule was imposed upon the players by the NFL defend-

---

**2.** Professional team sports athletes in the United States are generally represented by labor organizations, such as the NFLPA, which enter into collective bargaining agreements with league management to set and establish league-wide benefits such as pensions, severance payments, minimum salaries and grievance procedures. Players in all of the major professional team sports leagues, however, also play for their particular clubs pursuant to individual player contracts. Thus, each player in the NFL individually negotiates his salary and contract duration with the particular NFL club that employs him, subject to the broader conditions established in the collective bargaining agreement.

**3.** The written expression of the Rozelle Rule, contained in Article XII, Section 12, par. H of the Constitution and By–Laws of the National Football League, provided:

Any player, whose contract with the League Club has expired, shall thereupon become a free agent and shall no longer be considered a member of the team of that club following the expiration date of such contract. Whenever a player, becoming a free agent in such manner, thereafter signs a contract with a different club in the league, then, unless mutually satisfactory arrangements have been concluded between the two league clubs, the Commissioner may name and then award to the former club one or more players, from the Active Reserve, or Selection List (including future selection choices) of the acquiring club as the Commissioner in his sole discretion deems fair and equitable; any such decision by the Commissioner shall be final and conclusive.

ants from 1963 until 1976 when the Eighth Circuit held that the rule as implemented contravened the antitrust Rule of Reason and thus constituted an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. *Mackey v. National Football League*, 543 F.2d 606 (8th Cir. 1976), *cert. dismissed*, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977). In holding that the Rozelle Rule violated the antitrust laws under a Rule of Reason analysis,[4] the Eighth Circuit stated:

> In defining the restraint on competition for players' services, the district court found that the Rozelle Rule significantly deterred clubs from negotiating with and signing free agents; that it acts as a substantial deterrent to players playing out their options and becoming free agents; that it significantly decreases players' bargaining power in contract negotiations; that players are thus denied the right to sell their services in a free and open market; that as a result, the salaries paid by each club are lower than if competitive bidding were allowed to prevail; and that absent the Rozelle Rule, there would be increased movement in interstate commerce of players from one club to another. We find substantial evidence in the record to support these findings.

543 F.2d at 620.

From March 1, 1977 through July 15, 1982, a revised system of free agency existed in the NFL. The new Right of First Refusal/Compensation system was developed jointly by the NFLPA and the NFL Management Council in negotiations in 1976–1977 that led to the 1977 Collective Bargaining Agreement. The 1977 agreement was incorporated in a class action settlement, approved by the district court, that brought to an end five years of labor-management strife in the NFL. *See Alexander v. National Football League*, 1977–2 Trade Cas. (CCH) par. 61,730

(D.Minn.1977), [Available on WESTLAW, 1977 WL 1497], *aff'd sub nom., Reynolds v. National Football League*, 584 F.2d 280 (8th Cir.1978). In approving the settlement, the district court found that the 1977 bargaining agreement fundamentally modified traditional NFL player practices, eliminating "many of the problems which caused players to desire movement from one team to another." *Alexander*, 1977–2 Trade Cas. at par. 72,997, Findings par. 3.27. The district court further noted that the "revised compensation rule has been the subject of serious arm's-length collective bargaining and is the product of good faith collective bargaining between the NFLPA and the NFL Management Council." *Id.* at par. 73,000, Findings par. 3.52. In affirming the decision of the district court, the Eighth Circuit stated that it was a "near certainty" that the Agreement was the product of good faith collective bargaining and would be found exempt if that issue were presented to the Court. *Reynolds v. National Football League*, 584 F.2d at 288.

Notwithstanding the significant liberalization of the traditional free agency system, during the 5–year period covered by the 1977 Collective Bargaining Agreement, fewer than 50 out of 600 players received offers from other NFL clubs after becoming free agents. Plaintiffs allege that the only time players moved was when, in effect, a trade was arranged between two NFL clubs. That practice occurred on fewer than 20 occasions and only one player actually moved from one NFL club to another in a transaction in which draft choice compensation was payable.

The Right of First Refusal/Compensation system was again implemented in the 1982 Collective Bargaining Agreement. The 1982 Agreement, executed on December 11, 1982, by the NFLPA and the NFL Management Council, came at the conclusion of a 57–day strike by the NFL players.

---

**4.** Initially, the Court found that because the Rozelle Rule was not the subject of arm's-length collective bargaining but rather was unilaterally imposed upon plaintiffs, the player restraints were not immune from antitrust scrutiny by virtue of the nonstatutory "labor exemption" to the antitrust laws. Having determined that the player restraints at issue were not exempt from the antitrust laws, the Court proceeded to find that the Rozelle Rule constituted a violation of the antitrust laws under a Rule of Reason analysis.

The total package of employee benefits won by the union was substantial, with financial commitments by the NFL clubs exceeding $1.2 billion over the five seasons covered by the Agreement. The 1982 Agreement also modified the Right of First Refusal/Compensation system. Most significantly, the 1982 Agreement increased the salary levels at which draft choice compensation would be triggered. For example, the salary level at which a third-round draft choice would have to be paid for a veteran free agent entering his fourth NFL season increased from $55,000 in 1981 to $90,000 in 1983.

The 1982 Collective Bargaining Agreement expired on August 31, 1987.[5] The modifications incorporated in the Agreement did not increase player movement in the NFL and, in fact, during the 5-year period covered by the Agreement, not a single veteran player moved from one NFL club to another under the Right of First Refusal/Compensation system.[6] Negotiations both during and after expiration of the Agreement failed to produce an accord regarding the free agency system, and on September 22, 1987, the members of the NFLPA went on strike. Twenty-four days later, on October 15, 1987, the NFLPA ended the strike after the parties once again failed to reach a compromise on the free agency issue.

On February 1, 1988 the contracts of at least 450 veteran players will expire. For many of the players, this will be their last opportunity to negotiate a contract. Apparently, for a variety of reasons, many of the players would like to move to different teams or geographic locations. Because the existing system of free agency has not enabled players to move freely among the NFL clubs, plaintiffs commenced this action to enable the players to negotiate their new contracts in an environment of unrestricted free agency.[7]

## DISCUSSION

On October 15, 1987—the last day of the player strike—plaintiffs filed suit against the NFL defendants alleging that continued imposition of the free agency system violates the antitrust laws. Plaintiffs are now before the Court requesting injunctive relief prohibiting defendants from continuing to impose the system of player restraints discussed above.[8] Defendants' cross-motion asks this Court to declare that the dispute relating to the system of player restraints may be resolved only within the context of the national labor laws, and that the nonstatutory "labor exemption" insulates the challenged restraints from antitrust scrutiny.

Because a finding that the player restraints are "exempt" from antitrust scrutiny would obviate the need to address plaintiffs' motions, the Court shall first address the "labor exemption" issue.[9]

*Applicability of the Antitrust Laws*

The 1982 Collective Bargaining Agreement containing the system of player restraints at issue expired on August 31, 1987. Plaintiffs contend that because that agreement has expired, no labor exemption from the antitrust laws shields the player

5. Plaintiffs contend that the 1982 Collective Bargaining Agreement expired on September 15, 1987. The date of expiration of the Agreement has little effect upon the Court's analysis, and the Court shall assume that the Agreement expired on August 31, 1987.

6. Of the 1,415 players who became veteran free agents during the term of the 1982 Agreement (252 in 1983, 216 in 1984, 269 in 1985, 321 in 1986 and 357 in 1987), apparently only one player even received an offer from another club.

7. Defendants contend that the players' insistence upon obtaining free agency is, in fact, little more than an attempt to increase player salaries by inducing bidding among the NFL clubs.

8. Plaintiffs have also moved the Court for summary judgment declaring that defendants have wilfully acquired or maintained monopoly power in the market for major league professional football.

9. The Court begins its analysis with the sense that plaintiffs are seeking to gain through the courts what they could not win at the bargaining table. Nevertheless, in the absence of an exemption, if the practices engaged in by defendants violate substantive law, plaintiffs are entitled to redress.

restraints from antitrust scrutiny. Thus, the only issues presented by defendants' cross-motion are whether the nonstatutory labor exemption to the antitrust laws continues to protect the allegedly unlawful [10] system of player restraints following expiration of the collective bargaining agreement,[11] and if so, for how long.

Two types of labor exemptions—statutory and nonstatutory—insulate certain inherently anti-competitive union and union-employer activity from antitrust liability. The statutory labor exemption removes from the coverage of the antitrust laws certain legitimate, albeit anti-competitive, union activities because they are favored by federal labor policy.[12] The nonstatutory labor exemption, on the other hand, exempts certain anti-competitive union-employer activities from antitrust sanctions. The Supreme Court has recognized that in order to properly accommodate the congressional policy favoring free competition in business markets with the congressional policy favoring collective bargaining under the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, certain union-employer agreements must be accorded a limited nonstatutory exemption from antitrust sanctions. *See Connell Construction Co., Inc. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 621–622, 95 S.Ct. 1830, 1834–1835, 44 L.Ed.2d 418 (1975); *Amalgamated Meat Cutters v. Jewel Tea Co., Inc.*, 381 U.S. 676, 689, 85 S.Ct. 1596, 1601–02, 14 L.Ed.2d 640 (1965).

Generally, whether the nonstatutory exemption will protect a particular agreement turns upon whether the relevant federal labor policy is deserving of pre-eminence over federal antitrust policy under the circumstances of the particular case. *Mackey*, 543 F.2d at 613; *see also, Amalgamated Meatcutters v. Wetterau Foods*, 597 F.2d 133, 136 (8th Cir.1979). Defendants insist that, on the facts of this particular case, federal labor policy compels exemption of the player restraints from antitrust scrutiny.

Defendants advance two theories in support of their contention that the player restraints are exempt from review under the antitrust laws even though the collective bargaining agreement embodying those restraints has expired. Under the first theory, defendants assert that the challenged restraints are entitled to absolute immunity because they are subjects of mandatory bargaining affecting only parties to the employment relationship. Alternatively, defendants argue that the labor law "survival" doctrine provides the challenged restraints continued protection from the antitrust laws for an indefinite period following expiration of the collective bargaining agreement.

---

**10.** For the limited purpose of deciding this motion, the Court shall assume that the challenged system of player restraints is unlawful. The assumption is made solely for the sake of analytical convenience, and in no way reflects upon the merits of plaintiffs' allegations.

**11.** The *Mackey* Court did not reach this issue. There, the Eighth Circuit held that the labor exemption did not protect the Rozelle Rule from antitrust scrutiny because the Rule was not the product of arm's-length bargaining, but rather had been unilaterally imposed upon the players by the NFL clubs. Accordingly, the Court noted, "we need not decide whether the effect of an agreement extends beyond its formal expiration date for purposes of the labor exemption." 543 F.2d at 616 n. 18.

**12.** In *Bridgeman v. National Basketball Association*, 675 F.Supp. 960 (D.N.J.1987), the Court summarized the scope of the statutory labor exemption:

The concept of a labor exemption finds its source in sections 6 and 20 of the Clayton Act, 15 U.S.C. Section 17 and 29, U.S.C. section 52, and the Norris–LaGuardia Act, 29 U.S.C. sections 104, 105 and 113. Those provisions declare that labor unions are not combinations or conspiracies in restraint of trade, and specifically exempt certain union activities such as secondary picketing and group boycotts from the coverage of the antitrust laws. This statutory exemption insulates inherently anti-competitive collective activities by employees because they are favored by federal labor policy.

The statutory exemption extends to legitimate labor activities unilaterally undertaken by a union in furtherance of its own interests. It does not extend to concerted action or agreements between unions and non-labor groups. This is where the nonstatutory exemption comes into play.

*Bridgeman*, At 963–64 (citations omitted).

*Absolute Immunity Theory*

Defendants insist that "conduct in the context of collective bargaining relating to mandatory subjects of bargaining, and affecting only parties to the employment relationship, is not subject to the antitrust laws, whether or not there is a current or expired collective bargaining agreement." Essentially, defendants are asking this Court to declare that, as a matter of law, federal labor policy completely overrides antitrust interests in the context of mandatory collective bargaining where the anticompetitive effects are limited to the union-employer relationship.

In support of their contention, defendants draw heavily upon established labor law principles dictating non-interference in the bargaining process, and upon Justice Goldberg's concurring and dissenting opinions in the *Jewel Tea* and *Pennington* cases. In those cases, Justice Goldberg declared that "in order to effectuate congressional intent, collective bargaining activity concerning mandatory subjects of bargaining under the [National Labor Relations Act] is not subject to the antitrust laws." *United Mine Workers of America v. Pennington*, 381 U.S. 657, 710, 85 S.Ct. 1585, 1614, 14 L.Ed.2d 626 (1965); *Jewel Tea*, 381 U.S. at 710, 85 S.Ct. at 1614–15 (1965). The Eighth Circuit has noted, however, that Justice Goldberg's test "has never been adopted by a majority of the Supreme Court. Rather, a majority of the Court seems to favor an accommodation less heavily weighted in favor of labor policy." *Mackey*, 543 F.2d at 615 n. 14.

The nonstatutory labor exemption has never been applied to shield league-imposed player restraints merely because such restraints are subjects of mandatory collective bargaining. Indeed, the courts have not hesitated to apply the Sherman Act to club owner-imposed restraints on competition for players' services. *See McCourt v. California Sports, Inc.*, 600 F.2d 1193 (6th Cir.1979); *Mackey*, 543 F.2d 606; *Robertson v. National Basketball Ass'n.*, 389 F.Supp. 867 (S.D.N.Y.1975); *Kapp v. National Football League*, 390 F.Supp. 73 (N.D.Cal.1974); *Boston Professional Hock-*

*ey Association, Inc. v. Cheevers*, 348 F.Supp. 261 (D.Mass.1972), *remanded on other grounds*, 472 F.2d 127 (1st Cir.1972).

■ Granting a labor practice complete insulation from antitrust scrutiny merely because the activity concerns a subject of mandatory bargaining does not strike the proper accommodation between labor and antitrust laws. "Mandatory subjects of collective bargaining do not carry talismanic immunity from the antitrust laws." *Robertson*, 389 F.Supp. at 888. Congressional policy does not contemplate that the labor laws will automatically override antitrust interests. Accordingly, in the absence of a specific directive from a higher court, this Court will not extend indefinite, blanket protection to union-employer agreements merely because the challenged activity arises within the context of mandatory collective bargaining.

*Survival Doctrine Theory*

Under their second theory, defendants assert that the federal labor "survival doctrine" maintains the labor exemption in effect following expiration of the collective bargaining agreement. In order for the exemption to "survive" expiration of the agreement, however, the conduct at issue must have been protected during the existence of the agreement.

In *Mackey, supra*, the Eighth Circuit held that the proper accommodation of labor and antitrust interests requires that in order to qualify for the labor exemption to the antitrust laws, union-employer agreements must meet three requirements:

First, the labor policy favoring collective bargaining may potentially be given preeminence over the antitrust laws where the restraint on trade primarily affects only the parties to the collective bargaining relationship. Second, federal labor policy is implicated sufficiently to prevail only where the agreement sought to be exempted concerns a mandatory subject of collective bargaining. Finally, the policy favoring collective bargaining is furthered to the degree necessary to override the antitrust laws only where the agreement sought to be exempted is the

product of bona fide arm's-length bargaining. 543 F.2d at 614 (citations omitted).

Applying these principles to the facts presented here, it is clear that the player restraints contained in the 1982 Collective Bargaining Agreement were protected by the labor exemption during the life of the Agreement: the alleged restraint on trade affected only the parties to the agreements sought to be exempted; [13] the player restraints constituted a mandatory bargaining subject within the meaning of the National Labor Relations Act; [14] and the player restraints sought to be exempted were, in all probability, the product of bona fide arm's-length bargaining.

■ Plaintiffs apparently concede that the relevant provisions in the 1982 Collective Bargaining Agreement fulfill the first two elements of the *Mackey* test. Plaintiffs do not agree, however, that the player restraints at issue were the product of bona fide arm's-length bargaining, and they contend that summary judgment on this issue therefore is inappropriate. However, sufficient indicia of bona fide arm's-length bargaining exists to warrant entry of summary judgment on this issue in favor of defendants. Significant among the evidence before the Court is the following: the player restraints complained of are specifically contained in the 1982 Collective Bargaining Agreement signed by both the NFLPA and the NFL Management Council; the Preamble to the Agreement recites that the provisions therein are "the product of bona fide, arm's-length collective bargaining;" the Agreement contains a "no-suit" provision; plaintiffs did not challenge the legality of the player restraints or the "no-suit" provision during the existence of the Agreement; and the total package of employee benefits obtained by the NFLPA

exceeded $1.2 billion, at least some of which, presumably, was relinquished in consideration for the system of player restraints contained in the Agreement.

■ Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In order to withstand summary judgment, the nonmoving party must produce enough evidence so that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Court finds that, on the evidence before the Court, a reasonable jury could not conclude that the player restraints contained in the 1982 collective bargaining agreement were not the product of bona fide arm's-length negotiations. Accordingly, summary judgment on this issue shall be entered in favor of defendants.

Having found that the labor exemption insulated the player restraints during the existence of the 1982 Collective Bargaining Agreement, the Court now turns to the question whether the labor exemption "survives" expiration of the Agreement.

■ Basic principles of labor law dictate that provisions relating to mandatory subjects of bargaining "survive" formal expiration of the collective bargaining agreement. Typically, the parties to an expired agreement have an obligation to maintain the status quo as to these provisions until a new agreement is concluded or until the parties reach "impasse." [15] The governing

---

13. *See Mackey,* 543 F.2d at 615.

14. Under the National Labor Relations Act, "rates of pay, wages, hours of employment, or other conditions of employment" constitute the "mandatory subjects of collective bargaining." *See* 29 U.S.C. §§ 158(a)(5), 158(d), 159(a) (1982). Insofar as the challenged restraints depress player salaries and restrict a player's ability to move from one team to another, the restraints relate to "wages, hours and other terms

or conditions of employment." Thus, the player restraints constitute a mandatory bargaining subject within the meaning of the NLRA. *See Mackey,* 543 F.2d at 615.

15. Generally, impasse occurs "after good-faith negotiations have exhausted the prospects of concluding an agreement." *Taft Broadcasting Co.,* 163 NLRB Dec. (CCH) 475, 64 L.R.R.M. (BNA) 1386 (1967).

principle is that until impasse is reached, an employer is not free unilaterally to change the essential provisions of an expired collective bargaining agreement but must keep those provisions in effect and bargain with the union as to their possible modification. As stated by the Court in *Hinson v. NLRB*, 428 F.2d 133 (8th Cir.1970):

> The spirit of the National Labor Relations Act and the more persuasive authorities stand for the proposition that, even after expiration of a collective bargaining contract, an employer is under an obligation to bargain with the Union before he may permissibly make any unilateral change *in those terms and conditions of employment comprising mandatory bargaining subjects within the meaning of § 8(d) of the Act.* 428 F.2d at 137–38 (emphasis original).

The Eighth Circuit therefore held that existing terms and conditions continued by operation of law:

> The parties *had* agreed to a subsisting collective bargaining agreement which included the health, welfare, and retirement benefit provisions. The order [of the NLRB] does not compel petitioner to agree to any new or different contract provision; it simply requires him to abide by an obligation once extant by reason of the binding contract but then continuing on after its expiration, in limited form, *not by reason of the contract itself but because of the dictates of the policy embodied in the National Labor Relations Act.*

*Id.* at 138 (emphasis original). *See also Richardson v. Communications Workers of America,* 443 F.2d 974, 979 (8th Cir. 1971) ("the employee, the union and the company are placed on notice that even after the bargaining agreement terminates the rights and obligations of the parties continue under the umbrage of the National Labor Relations Act"); *accord Fibreboard Paper Products Corp. v. NLRB,* 379

U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964); *NLRB v. Cone Mills Corp.,* 373 F.2d 595, 598 (4th Cir.1967) (provisions in collective bargaining agreement "survive" its termination in that union must be given opportunity to bargain before employer can make changes).[16]

The reason for this emphasis on maintaining the status quo is to provide the parties with a stable environment in which to negotiate a new collective bargaining agreement. "Freezing the status quo ante after a collective agreement has expired promotes industrial peace by fostering a noncoercive atmosphere that is conducive to serious negotiations on a new contract." *Laborers Health and Welfare Trust Fund v. Advanced Lightweight Concrete Co. Inc.,* 779 F.2d 497, 500 (9th Cir.1985), *cert. granted,* —— U.S. ——, 107 S.Ct. 1283, 94 L.Ed.2d 142 (1987).

In order to properly accommodate the antitrust policy promoting free competition with the labor law obligation requiring the parties to maintain the status quo following expiration of a collective bargaining agreement, the Court holds that the nonstatutory labor exemption must also "survive" expiration of the Agreement. A New Jersey district court recently reached the same conclusion on nearly identical facts. In *Bridgeman v. National Basketball Association,* 675 F.Supp. 960 (D.N.J.1987), a group of professional basketball players sued the National Basketball Association, alleging that various player restraints imposed by the NBA violated the antitrust laws. After balancing the competing interests of the antitrust and labor laws, the Court concluded that there was

> no merit in the players' contention that restrictions included in a collective bargaining agreement should lose their antitrust immunity the moment the agreement expires.... [S]uch a rule is unrealistic in light of the requirement that employers must bargain fully and in

---

**16.** The obligation to bargain before changing the status quo exists whether or not the changes favor employees or employer. *NLRB v. Katz,* 369 U.S. 736, 742–43, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962). In addition, the obligation to maintain the status quo applies not only to

wages but to various other terms and conditions of employment. *See e.g., NLRB v. Southwest Security Equipment Corp.,* 736 F.2d 1332, 1337 (9th Cir.1984), *cert. denied,* 470 U.S. 1087, 105 S.Ct. 1854, 85 L.Ed.2d 151 (1985) (hiring hall provisions survive expiration).

good faith before altering a term or condition of employment subject to mandatory bargaining even after the collective bargaining agreement expires.... This obligation to maintain the status quo until impasse means that, in a practical sense, terms and conditions of employment that are subjects of mandatory bargaining service expiration of the collective bargaining agreement.

*Bridgeman,* at 965 (citations omitted).

Commentators addressing this issue have also advocated application of the "survival" doctrine to labor exemptions:

> The employer's obligation to bargain before acting unilaterally means that, in a practical sense, those terms and conditions of employment that are subjects of mandatory bargaining "survive" expiration. Player restraints, as mandatory bargaining subjects, thus remain in effect after the formal expiration date of collective agreements. In view of this "survival" principal [sic], it follows that the labor exemption should remain available to immunize previously bargained-for player restraints as long as good faith bargaining continues after the collective agreement expires....

Note, *Applicability of the Labor Exemption After the Expiration of Collective Bargaining Agreements in Professional Sports,* 57 N.Y.U.L.Rev. 164, 195–97 (1982); *see also* Berry & Gould, *A Long Deep Drive to Collective Bargaining: Of Players, Owners, Brawls, and Strikes,* 31 Case W. Res. 685, 774 (1981) ("a rule withdrawing [antitrust] immunity because the previous contract expired before a new agreement is reached is contrary to national labor law").

Having determined that the labor exemption "survives" expiration of the collective bargaining agreement, the Court must now determine the period of time for which the exemption remains in effect.

Plaintiffs concede that the labor exemption does not die automatically upon expiration of the collective bargaining agreement. Plaintiffs contend, however, that immunity from antitrust liability lasts only until the employees no longer consent to imposition of the formerly exempted conditions. Specifically, plaintiffs argue that following expiration of a collective bargaining agreement, labor-exempt anticompetitive practices are protected only until the employees have made it "unequivocally clear" that they will no longer assent to continued imposition of the terms or practices.[17]

For a number of reasons, the Court will not accept the endpoint proposed by plaintiffs. First, the Court rejects plaintiffs' proposal because application of their standard could subject an employer to "instant" antitrust liability, including treble damages. Although plaintiffs do not contend that the labor exemption expires "automatically" upon termination of the collective bargaining agreement, it is clear that under plaintiffs' standard, antitrust liability may be imposed contemporaneously with the expiration of an agreement. In the instant case for example, plaintiffs claim that they have insisted for more than a year that they will no longer assent to imposition of the current system of player restraints. It is possible that at some point prior to expiration of the Collective Bargaining Agreement, plaintiffs' manifestations made it "unequivocally clear" that plaintiffs no longer consented to the challenged restraints. Thus, under plaintiffs' proposed standard, defendants could have been subjected to antitrust liability instantly upon expiration of the existing agreement.

In addition to the obvious implications of "instant" antitrust liability, plaintiffs' pro-

---

**17.** Without stating the exact point in time at which the players made it "unequivocally clear" that they no longer consented to the challenged restraints, plaintiffs insist that that point has long since passed. Plaintiffs contend that they have manifested their disaffection in a variety of ways since approximately April of 1987. Plaintiffs claim that by various representations made during the course of negotiations, in public statements and in informal meetings, by the contents of its "Game Plan '87" brochure, and by the 27–day strike in the fall of 1987, plaintiffs made it unequivocally clear that they will not consent to continued imposition of the system of player restraints at issue.

posed standard completely disregards established labor law principles imposing upon the parties the duty to negotiate in good faith as to mandatory bargaining subjects following expiration of a collective bargaining agreement. *See NLRB v. Katz,* 369 U.S. 736, 747–48, 82 S.Ct. 1107, 1113–14, 8 L.Ed.2d 230 (1962). Under the survival doctrine, an employer cannot unilaterally change the terms and conditions of employment following expiration of a bargaining agreement, but must maintain the status quo at least until impasse. The labor law obligation to maintain the status quo means that an employer may not affect a unilateral change either for or against the interests of the employees. *Katz,* 369 U.S. at 742–43, 82 S.Ct. at 1111. Thus, in the instant case, even if defendants had unilaterally liberalized the player restraints following expiration of the collective bargaining agreement, they could have been brought before the National Labor Relations Board and charged with a labor law violation. This Court is not willing to adopt a rule of law that exposes an employer to treble damage antitrust liability by meeting a labor law obligation.

Even more troublesome to the Court, however, is the likelihood that plaintiffs' proposal would subvert the strong federal labor policy underlying the collective bargaining process. Rather than foster intense, good faith negotiations following termination of an agreement, plaintiffs' proposal invites the opposite behavior: in order to make it "unequivocally clear" that there is no longer consent to a particular practice, plaintiffs' standard essentially requires employees to refrain from negotiating and to adhere unyieldingly to a stated position. As plaintiffs' proposed standard would effectively undermine the federal labor policy underlying the collective bargaining process, that standard must be rejected.

In the alternative, plaintiffs apparently endorse the standard enunciated in *Bridgeman, supra,* for determining the point at which the labor exemption ends. The Court in *Bridgeman,* after rejecting various endpoints proposed by both parties, formulated its own standard:

I find that the exemption for a particular practice survives only as long as the employer continues to impose that restriction unchanged, and reasonably believes that the practice or a close variant of it will be incorporated in the next collective bargaining agreement. When the employer no longer has such a reasonable belief, it is then unilaterally imposing the restriction on its employees, and the restraint can no longer be deemed the product of arm's-length negotiation between the union and the employer. *Bridgeman,* at 967.

The *Bridgeman* standard, while considerably more appealing than that proposed by plaintiffs, must also be rejected. The Court's principal objection to the *Bridgeman* test is that the standard does not give proper regard to the strong labor law policy promoting the collective bargaining process. Presumably, an employer's "reasonable belief" that a practice will be incorporated in a new agreement is based upon various manifestations by the employees indicating assent or willingness to compromise. Knowing that a provision's exempt status would expire once an employer could no longer have a "reasonable belief" that the practice would be incorporated in a new agreement, employees would have every incentive to furnish the requisite indicia of disaffection and unwillingness to bargain. By encouraging employees to exhibit steadfast, uncompromising adherence to stated terms, the *Bridgeman* standard would subvert the strong federal labor law interest in promoting the collective bargaining process. As the *Bridgeman* test does not strike the proper accommodation between labor and antitrust interests, that test will also be rejected.

The endpoints suggested by defendants are also unacceptable. Defendants would like this Court to declare that a labor exemption concerning a mandatory bargaining subject survives indefinitely. Defendants urge that terms or conditions, once agreed to, become a fixed part of the status quo and that plaintiffs thereafter may alter those terms only by bringing economic pressure to bear upon the employer. Al-

ternatively, defendants argue that a labor-exempt condition should remain in effect for the duration of the collective bargaining relationship.[18] Both proposals accord the labor exemption undue longevity. Indeed, defendants' suggested standards would accord greater longevity to illegal provisions than to lawful terms and conditions: in the usual context, following expiration of a collective bargaining agreement, lawful provisions relating to wages, hours and terms and conditions of employment continue in effect only until "impasse." "Impasse" merely signifies a stalemate in negotiations, and is not equivalent to termination of the collective bargaining relationship.[19] Thus, defendants' proposed standards would lead to the anomalous result that illegal provisions exempted from antitrust scrutiny would continue in force longer than lawful terms and conditions. The Court cannot adopt a rule of law that accords labor-exempted provisions greater longevity than lawful ones. Accordingly, defendants' proposed standards must also be rejected.

■ The Court, having rejected the parties' proposals, must devise for itself the point at which the labor exemption ends. After balancing the various competing interests, the Court concludes that proper accommodation of labor and antitrust interests requires that a labor exemption relating to a mandatory bargaining subject survive expiration of the collective bargaining agreement until the parties reach impasse *as to that issue;* thereafter, the term or condition is no longer immune from scrutiny under the antitrust laws, and the employer runs the risk that continued imposition of the condition will subject the employer to liability.

■ The test applied in determining whether the parties have reached impasse as to a particular issue is the same as that applied in determining impasse in the negotiations as a whole.[20] The test is simply whether, following intense, good faith negotiations, the parties have exhausted the prospects of concluding an agreement. *Taft Broadcasting Co.,* 163 NLRB at 478. Impasse is generally synonymous with deadlock: it occurs when the parties have discussed the matter and, despite their best efforts to achieve agreement, neither is willing to move from its position. No impasse can occur until there appears no realistic possibility that continuing discussions concerning the provision at issue would be fruitful. *See Mariott In–Flite Servs., Div. of Mariott Corp.,* 258 NLRB Dec. (CCH) 755, 108 L.R.R.M. (BNA) 1287 (1981), *enforced,* 113 L.R.R.M. (BNA) 3528, *aff'd* 729 F.2d 1441 (2nd Cir.1983), *cert. denied,* 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108 (1983); *Morco, Inc. d/b/a Town Plaza Hotel,* 258 NLRB (Dec. (CCH) 69, 108 L.R.R.M. (BNA) 1126 (1981); *J.D. Lunsford Plumbing, Heating & Air Conditioning, Inc.,* 254 NLRB Dec. (CCH) 1360, 107 L.R.R.M. (BNA) 1033 (1981), *aff'd,* 684 F.2d 1033 (D.C.Cir.1982).

Under the Court's formulation, a determination that the parties have reached impasse as to a particular issue results in termination of the labor exemption protect-

---

**18.** Generally the collective bargaining relationship between an employer and a particular union exists for as long as that union continues to be the recognized bargaining representative of a majority of the employees.

**19.** "As a recurring feature in the bargaining process, impasse is only a temporary deadlock or hiatus in negotiations 'which in almost all cases is eventually broken, through either a change of mind or the application of economic force.'" *Charles D. Bonanno Linen Service, Inc. v. NLRB,* 454 U.S. 404, 412, 102 S.Ct. 720, 725, 70 L.Ed.2d 656 (1982) (quoting *Charles D. Bonanno Linen Service, Inc.,* 243 N.L.R.B. 1093, 1093–1094 (1979)).

**20.** In *Taft Broadcasting Co.,* the National Labor Relations Board enumerated some of the considerations in making an "impasse" determination:

Whether a bargaining impasse exists is a matter of judgment. The bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, the contemporaneous understanding of the parties as to the state of negotiations are all relevant factors to be considered in deciding whether an impasse in bargaining existed.

*Taft Broadcasting Co.,* 163 NLRB Dec. (CCH) at 478.

ing that particular provision. In the instant case, once the parties reach impasse concerning the player restraint provisions, those provisions will lose their immunity and further imposition of those conditions may result in antitrust liability.[21]

The Court's formulation has a number of advantages over the standards proposed by the parties. First, unlike plaintiffs' proposal, the Court's formulation respects the labor law obligation to bargain in good faith over mandatory bargaining subjects following expiration of a collective bargaining agreement. Additionally, by requiring the parties to bargain in good faith until impasse, the Court's standard promotes the collective bargaining relationship and enhances prospects that the parties will reach a compromise on the issue. The Court's formulation seems especially appropriate in light of the Eighth Circuit's observation in *Mackey, supra,* that:

> It may be that some reasonable restrictions relating to player transfers are necessary for the successful operation of the NFL. The protection of mutual interests of both the players and the clubs may indeed require this. We encourage the parties to resolve this question through collective bargaining. The parties are far better situated to agreeably resolve what rules governing player transfers are best suited for their mutual interests than are the Courts.

543 F.2d at 623.

The Court's formulation, while lending full respect to labor interests, does not substantially override antitrust concerns. By allowing a labor exemption to survive only until impasse, the law will not insulate a practice from antitrust scrutiny, but will only delay enforcement of the substantive law until continued negotiations over the challenged provision become pointless.

The Court's formulation thus strikes a better accommodation between the competing labor and antitrust interests than any of the tests proposed by the parties.

■ In sum, the Court holds that the nonstatutory labor exemption insulated the Right of First Refusal/Compensation system and the NFL Player Contract during the life of the 1982 Collective Bargaining Agreement, and that the labor exemption will continue to protect the challenged restraints until the parties reach impasse as to those issues.

Whether the parties have, in fact, reached impasse as to the free agency issues is not clear.[22] Even if the evidence were clear, however, the Court could not make the impasse determination at this time. As noted, the duty to bargain in good faith concerning mandatory bargaining subjects continues until impasse. In the instant case, defendants have filed a charge with the NLRB alleging that plaintiffs have not bargained in good faith. Because a finding of good faith must be made as a precondition to determining impasse, the Court must await the NLRB's "good faith" determination.

Accordingly, the Court shall also stay decision of the remaining motions pending determination of the "impasse" question.

IT IS SO ORDERED.

---

**21.** *Of course, liability will attach only if the challenged practices do in fact violate the antitrust laws.*

**22.** Notwithstanding the various actions and representations made by the parties, it does not appear that the players and management are engaged in the "head-on encounter of irresistible force and immovable body." *Fetzer Television, Inc. v. NLRB,* 317 F.2d 420 (6th Cir.1963).

There is abundant evidence in the record to indicate the parties are not so far apart in negotiations as this lawsuit would suggest. For example, plaintiffs are not demanding unrestricted free agency, but only that a player be free to move, without substantial restriction, at *some point* in his career. Likewise, defendants have exhibited a willingness to bargain by proposing substantial modifications to the existing system.