Marvin POWELL, Brian Holloway, Michael Kenn, Michael Davis, James Lofton, Michael Luckhurst, Dan Marino, George Martin, Steve Jordan and the National Football League Players Association on behalf of themselves and all class members, Plaintiffs,

v.

NATIONAL FOOTBALL LEAGUE; The Five Smiths, Inc., d/b/a Atlanta Falcons; Buffalo Bills, Inc., d/b/a Buffalo Bills; Chicago Bears Football Club, Inc., d/b/a Chicago Bears; Cincinnati Bengals, Inc., d/b/a Cincinnati Bengals; Cleveland Browns, Inc., d/b/a Cleveland Browns; The Dallas Cowboys Football Club, Ltd., d/b/a Dallas Cowboys; PDB Sports, Ltd., d/b/a Denver Broncos; The Detroit Lions, Inc., d/b/a Detroit Lions; The Green Bay Packers, Inc., d/b/a Green Bay Packers; Houston Oilers, Inc., d/b/a Houston Oilers; Indianapolis Colts, Inc., d/b/a Indianapolis Colts; Kansas City Chiefs Football Club, Inc., d/b/a Kansas City Chiefs; The Los Angeles Raiders, Ltd., d/b/a Los Angeles Raiders; Los Angeles Rams Football Company, Inc., d/b/a Los Angeles Rams; Miami Dolphins, Ltd., d/b/a Miami Dolphins; Minnesota Vikings Football Club, Inc., d/b/a Minnesota Vikings; New England Patriots Football Club, Inc., d/b/a New England Patriots; The New Orleans Saints Limited Partnership, d/b/a New Orleans Saints; New York Football Giants, Inc., d/b/a New York Giants; New York Jets Football Club, Inc., d/b/a New York Jets; The Philadelphia Eagles Football Club, Inc., d/b/a Philadelphia Eagles; Pittsburgh Steelers Sports, Inc., d/b/a Pittsburgh Steelers; The St. Louis Football Cardinals, Inc., d/b/a St. Louis Cardinals; The Chargers Football Company, d/b/a San Diego Chargers; The San Francisco Forty-Niners, Ltd., d/b/a San Francisco 49ers; The Seattle Professional Football Club, d/b/a Seattle Seahawks; Tampa Bay Area NFL Football, d/b/a Tampa Bay Buccaneers; and Pro-Football, Inc., d/b/a Washington Redskins, Defendants.

Civ. No. 4-87-917.

United States District Court,
D. Minnesota,
Fourth Division.

July 11, 1988.

Edward M. Glennon, Carol T. Rieger, J. Michael Dady, Luke H. Terhaar, Charles J. Lloyd, and Lindquist & Vennum, Minneapolis, Minn., for plaintiffs; Richard A. Berthelsen, Washington, D.C., of counsel.

William T. Egan and Rider, Bennett, Egan & Arundel, Minneapolis, Minn., for defendants; Covington & Burling, John H. Schafer, Paul J. Tagliabue, Herbert Dym and Jeffrey Pash, Washington, D.C., of counsel.

Pepin, Dayton, Herman, Graham & Getts, Charles J. Dayton, Minneapolis, Minn., for plaintiff-intervenor, Kelly Stouffer; Greer, Homer, Cope & Bonner, Bruce W. Greer and Laura Besvinick, Miami, Fla., of counsel.

Rider, Bennett, Egan & Arundel, William T. Egan and Richard J. Nygaard, Minneapolis, Minn., for defendant-intervenor— NFL Management Council, and all defendants; Richard N. Appel, Akin, Gump, Strauss, Hauer & Feld, Laurence J. Hoffman, Washington, D.C., of counsel.

## MEMORANDUM AND OPINION

DOTY, District Judge.

Plaintiffs bringing this motion are the National Football League Players Association ("NFLPA") and all veteran free agent[1] professional football players currently playing in the National Football League ("NFL"). Defendants own the teams which employ the players.

The instant action arises principally[2] out of a dispute between the parties over the rights of veteran free agents to play for the NFL clubs of their choosing.[3] For more than a decade, the movement of veteran free agents has been subject to the Right of First Refusal/Compensation System. Under the Right of First Refusal/Compensation System, every NFL club retains certain rights to "its" veteran free agent players even though contractual rights to those players no longer exist. The "Right of First Refusal" provides that when a veteran player's contract expires and a competing NFL club makes an offer to that player, the old team may keep the player by matching the competing offer; the player's old club therefore is said to have a "Right of First Refusal" as to that player's services. If the club to which the player was previously under contract does not choose to match the offer, the old club will receive draft choice "Compensation" which is extremely costly to the acquiring club.

As implemented under two successive collective bargaining agreements, the Right of First Refusal/Compensation System has essentially eliminated competition among NFL clubs for player services. Consequently, only two players in the past decade have moved from one NFL club to another in a transaction in which draft choice compensation was payable.

The most recent collective bargaining agreement incorporating the Right of First Refusal/Compensation System expired on August 31, 1987. When negotiations fol-

---

1. A "veteran free agent" is a veteran player whose contract has expired.

2. The players' suit also challenges the legality of the College Draft and the NFL Player Contract.

3. The facts underlying the instant case are set forth more fully at *Powell*, 678 F.Supp. 778–781.

*See Powell v. National Football League,* 678 F.Supp. 777, 778–781 (D.Minn.1988).

lowing expiration of the agreement failed to produce an accord on the free agency issue, the members of the NFLPA went on strike. When the strike also failed to yield the desired results, the players looked to the courts to win greater player movement.

On October 15, 1987, the players filed suit against the owners alleging that various restrictions on player movement violate the antitrust laws. On November 23, 1987, the players moved the Court to preliminarily enjoin the owners from continuing to impose restraints upon player movement until the matter could be resolved at trial. The owners responded to the players' motion by seeking a declaration from the Court that the system of player restraints at issue is immune from antitrust scrutiny. A hearing on the motions was held December 30, 1987.

In the Memorandum and Opinion issued after the hearing, the Court ruled that, notwithstanding expiration of the collective bargaining agreement, the system of player restraints retained its immunity to antitrust attack until the parties reached a bargaining impasse over that issue. *See Powell,* 678 F.Supp. at 788. The Court additionally noted that it could not make an "impasse" determination at that time because the owners' charge that the players had not bargained in good faith was still pending before the National Labor Relations Board.

On April 28, 1988, the Associate General Counsel to the NLRB dismissed the owners' charge of bad faith bargaining. The owners did not seek review of that decision, and the players promptly renewed their motion for a preliminary injunction. The players' motion, which is the subject of this Memorandum and Opinion, seeks to preliminarily enjoin the owners from continuing to impose a system that would limit the ability of veteran free agent players to negotiate with, and ultimately play for, any NFL team. Put another way, the players are asking the Court to declare unrestricted free agency until the matter is finally resolved on the merits.

The owners responded to the players' renewed motion by moving the Court for summary judgment declaring that the parties were not yet at impasse, that the players failed to satisfy the Eighth Circuit standard for obtaining injunctive relief, and that the Norris–LaGuardia Act deprived the Court of jurisdiction to enter an injunction against the owners in this case.

At the June 17, 1988 hearing on the motions, the Court rendered its decision that the parties had in fact reached a bargaining impasse over the free agency issue, and that the system of restraints on player movement was now subject to the antitrust laws. The Court took the Norris–LaGuardia Act and preliminary injunction issues under advisement, and those issues are the subject of this Memorandum and Opinion.

## DISCUSSION

### I. *Application of the Norris–LaGuardia Act*

■ With limited exceptions, the Norris–LaGuardia Act, 29 U.S.C. § 101 *et seq.* (1982), deprives federal courts of jurisdiction to issue injunctions in cases "involving or growing out of labor disputes." 29 U.S.C. § 101.[4] The term "labor dispute" is defined broadly in the statute as "any controversy concerning terms or conditions of employment." 29 U.S.C. § 113(c). "The Act's scope is intentionally broad, covering any case ... in which 'the employer-employee relationship [is] the matrix of the controversy.'" *United Telegraph Workers, AFL–CIO v. Western Union,* 771 F.2d 699 (3rd Cir.1985) (quoting *Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n.,* 457 U.S. 702, 712–13, 102 S.Ct. 2672, 2680, 73 L.Ed.2d 327 (1982)).

It is clear that the issue of player movement relates to a term or condition of em-

---

4. Section 101 reads:
   No Court of the United States ... shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of this chapter; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in this chapter.

ployment [5] and the players do not challenge application of the Act on that basis. Rather, the players argue that any "dispute" which existed over free agency ended once the parties reached a bargaining impasse on that issue. The players contend that restrictions on player movement are now being unilaterally imposed by the owners, and that the controversy therefore has ceased to be a "labor dispute" and is now governed exclusively by the antitrust laws.

While the Court agrees that existing restrictions on free agency are being unilaterally imposed by the owners, and that such restrictions are now subject to the antitrust laws, the Court does not agree that the presence of a bargaining impasse signifies the end of a "labor dispute." Indeed, a bargaining impasse is by definition a "labor dispute." As this Court noted in its earlier opinion,[6] an impasse merely signifies a stalemate in negotiations—it does not mark the end of labor relations generally. For at least a decade, the players and owners have consistently treated the free agency issue as a negotiable term or condition of employment.[7] Under these circumstances, and where the bargaining relationship and the collective bargaining process remains intact, a controversy regarding terms or conditions of employment constitutes a labor dispute. Accordingly, the Court concludes that the current controversy surrounding the free agency issue constitutes a "labor dispute" as contemplated by the Norris–LaGuardia Act.

■ Notwithstanding the Act's general prohibition on granting injunctive relief in cases involving labor disputes, a party may obtain an injunction if it can meet the requirements of § 107. In order to obtain injunctive relief under § 107, a party must demonstrate:

(a) That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained ...;

(b) That substantial and irreparable injury to complainant's property will follow;

(c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;

(d) That complainant has no adequate remedy at law; and

(e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

29 U.S.C. § 107.

Even if the players could show that they would incur irreparable harm to their property, that public officers would be unable to protect their property, that unlawful acts would be committed, and that they are without an adequate remedy at law, the Court would not grant the players' motion because greater harm would befall the owners if the injunction were granted than would befall the players if injunctive relief were not granted.

On February 1, 1988, the contracts of more than 450 veteran players expired. As of June 17, 1988, more than 300 veteran free agents had not yet signed with an NFL team. The players contend that, for a variety of reasons, a substantial number of these veteran free agents would like to

---

**5.** *See Mackey v. National Football League,* 543 F.2d 606, 615 (8th Cir.1976), *cert. dismissed,* 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977).

**6.** *Powell,* 678 F.Supp. at 788.

**7.** The instant case is distinguishable from *Mackey, supra,* in which the Court of Appeals stated that "[i]t is not clear that the instant controversy constitutes ... a labor dispute [under the Norris–LaGuardia Act]." 543 F.2d at 623. In *Mackey,* the challenged system of player restraints (the Rozelle Rule) had been imposed by the NFL outside the collective bargaining context before the players had even unionized, and the restraint had "remained unchanged since it was unilaterally promulgated by the clubs...." *Id.* at 616. Moreover the Rozelle Rule had not been a concrete issue in collective bargaining, with "nothing which could be legitimately characterized as bargaining over the Rozelle Rule...." *Id.* at 615. *Mackey* is "thus properly read as a case in which the disputed restraint had not yet entered the sphere of collective bargaining" because "there had been no exchange, no bargaining, and no consent." Weistart, *Judicial Review of Labor Agreements: Lessons From the Sports Industry,* 44 Law & Contemp.Probs. 109, 122–123 (1982).

move to different NFL teams. The players urge that unless the Court declares unrestricted free agency immediately, the opportunity to play for a different club will be permanently lost for many of the veteran players.

Part (c) of § 107 requires the Court to weigh the harm to the players if injunctive relief is denied against the harm that would befall the owners if the injunction is granted. Taking the players' representation as true that a significant percentage of the unsigned players would move to new teams, it is highly probable that an injunction creating unrestricted free agency would irreparably harm the owners and have a deleterious effect upon professional football generally. As noted by the Eighth Circuit Court of Appeals in *Reynolds v. National Football League*, 584 F.2d 280, 287 (8th Cir.1978), the players' insistence upon complete, unrestricted freedom of movement from club to club

> ignores the structured nature of any professional sport based on league competition. Precise and detailed rules must of necessity govern how the sport is played, the rules of the game, and the acquisition, number, and engagement of players. While some freedom of movement after playing out a contract is in order, complete freedom of movement would result in the best franchises acquiring most of the top players. Some leveling and balancing rules appear necessary to keep the various teams on a competitive basis, without which public interest in any sport quickly fades.

Although the requested injunction would only be "preliminary" pending final resolution of this matter, its effects may be felt for years since many players who moved undoubtedly would sign long-term contracts with their new clubs. As the potential harm to the owners greatly outweighs that presented to the players, the Court must deny the players' motion.

The strong federal labor policy embodied in the Norris–LaGuardia Act dictating noninterference in the bargaining process also compels denial of the players' request for injunctive relief.

In 1932, Congress enacted the Norris–LaGuardia Act primarily to curb widespread management attempts to subvert labor strength by obtaining injunctions against various labor activities.[8] In *Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 250–251, 90 S.Ct. 1583, 1592–1593, 26 L.Ed.2d 199 (1970), the United States Supreme Court described the situation which the Norris–LaGuardia Act was enacted to redress:

> In the early part of this century, the federal courts generally were regarded as allies of management in its attempt to prevent the organization and strengthening of labor unions; and in this industrial struggle the injunction became a potent weapon that was wielded against the activities of labor groups. The result was a large number of sweeping decrees, often issued *ex parte*, drawn on an *ad hoc* basis without regard to any systematic elaboration of national labor policy.

In 1932 Congress attempted to bring some order out of the industrial chaos that had developed and to correct the abuses that had resulted from the interjection of the federal judiciary into union-management disputes on the behalf of

---

**8.** Section 102 of the Act sets forth the policy underlying the Act:

> Whereas under prevailing economic conditions, developed with the aid of governmental authority for owners of property to organize in the corporate and other forms of ownership association, the individual unorganized worker is commonly helpless to exercise actual liberty of contract and to protect his freedom of labor, and thereby to obtain acceptable terms and conditions of employment, wherefore, though he should be free to decline to associate with his fellows, it is necessary that he have full freedom of association,

self-organization, and designation of representatives of his own choosing, to negotiate the terms and conditions of his employment, and that he shall be free from the interference, restraint, or coercion of employers of labor, or their agents, in the designation of such representatives or in self-organization or in other concerted activities for the purpose of collective bargaining or other mutual aid or protection; therefore, the following definitions of and limitations upon the jurisdiction and authority of the courts of the United States are enacted.

management. Congress, therefore, determined initially to limit severely the power of the federal courts to issue injunctions "in any case involving or growing out of any labor dispute...."

(citations omitted).

The Court also noted that "[a]s labor organizations grew in strength and developed toward maturity, *congressional emphasis shifted from protection of the nascent labor movement to the encouragement of collective bargaining* and to administrative techniques for the peaceful resolution of industrial disputes." *Id.* at 251, 90 S.Ct. at 1593 (emphasis added). Since the Court's pronouncement in *Boys Markets,* courts have increasingly recognized the broad policy underlying the Norris–LaGuardia Act to encourage collective bargaining and prevent judicial interference in management-labor relations. *See United Telegraph Workers, AFL–CIO v. Western Union,* 771 F.2d 699, 703–704 (3rd Cir.1985); *Heheman v. E.W. Scripps Co.,* 661 F.2d 1115, 1124 (6th Cir.1981), *cert. denied,* 456 U.S. 991, 102 S.Ct. 2272, 73 L.Ed.2d 1286 (1982). Given the current status of management-labor relations in the United States, it appears that where judicial intervention would undermine the bargaining process, it is the general intent of Congress to deprive the courts of jurisdiction to issue injunctive relief.

After careful consideration, it is the opinion of the Court that granting the players a preliminary injunction to secure unrestricted free agency would wholly subvert the collective bargaining process and thereby offend a central purpose of the Norris–LaGuardia Act.

Collective bargaining involves agreements on, and trade-offs among, a broad range of different items affecting the terms and conditions of employment. For a court to align itself with one of the parties by, in effect, eliminating from bargaining one of the major items in the bargaining mix, would work a wholesale subversion of the collective bargaining . process:

> Enjoining enforcement of [player] restraints in this context would not only introduce an unjustifiable distortion in bargaining power, but would discourage bargaining toward realization of a signed agreement. If a union knows that when an agreement expires it can seek to enjoin enforcement of previously agreed-upon restraints, it will be reluctant to bargain seriously toward a new agreement.

Note, *Application of the Labor Exemption After the Expiration of Collective Bargaining Agreements In Professional Sports,* 57 N.Y.U.L.Rev. 164, 197 (1982).

In any event, it would be highly destructive to collective bargaining if major issues could be removed from the bargaining table and preliminarily resolved in isolation in antitrust litigation.[9] If one of the parties to the bargaining relationship were able to secure the substance of its bargaining objectives by obtaining a preliminary injunction, there would be very little motivation for that party to bargain in good faith toward reaching an agreement. Judicial intervention at this stage of the bargaining process would give one side a preliminary victory while effectively disabling the other.

Because a preliminary injunction would distort the relative bargaining strength of the parties and effectively undermine the collective bargaining process, the Court concludes that it is without jurisdiction to enter a preliminary injunction on these facts.[10]

---

**9.** The Court's ruling does not provide the system of player restraints extended immunity to the antitrust laws. The Court's ruling merely denies injunctive enforcement of the antitrust laws until after a final resolution on the merits.

**10.** By declining to inject itself into the controversy, the Court enables the parties to continue negotiating in the stable and familiar environment of the status quo. And although the pendency of an antitrust suit will undoubtedly have some effect on bargaining, the impact will not be nearly so coercive as that presented by injunctive intervention. Indeed, the Court's ruling may produce the added benefit of actually moving the parties closer together in negotiations: The threat posed by the pendency of an antitrust suit—including the potential of treble damage liability—will surely inspire the owners

## II. *Application of the Dataphase Test*

■ Even if the Norris–LaGuardia Act would not prohibit the Court's intervention, the governing standard for obtaining injunctive relief would foreclose the players from becoming unrestricted free agents at this time.

In the Eighth Circuit, whether a preliminary injunction should issue turns upon the balancing of four factors:

1. The threat of irreparable harm to the movant;

2. The state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant;

3. The probability that movant will succeed on the merits; and

4. The public interest.

*Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 113 (8th Cir.1981) (*en banc*).

None of these factors by itself is determinative. "[R]ather, in each case the four factors must be balanced to determine whether they tilt toward or away from granting a preliminary injunction." *West Pub. Co. v. Mead Data Cent., Inc.*, 799 F.2d 1219, 1222 (8th Cir.1986), *cert. denied*, 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987), *citing Dataphase Systems*, 640 F.2d at 13.

Although the Court finds it probable that the players will prevail at trial, and that at least some of the players are likely to sustain irreparable harm if they are not immediately permitted to sign with other NFL clubs, for the reasons set forth above, the Court shall not grant the players' motion for injunctive relief.

Briefly, the Court finds that the potential migration of many key players from less attractive clubs to more desirable ones could have a devastating, long-term impact on the competitive balance within the league. The danger that destruction of the competitive balance could ultimately lead to diminished spectator interest and franchise failures itself constitutes a sufficient basis for denying the requested injunctive relief.

Consideration of the public interest also compels denial of the players' motion. The Norris–LaGuardia Act and substantive national labor laws establish that federal labor policy favors resolution of labor disputes through collective bargaining accompanied, if necessary, by economic sanctions. If the Court intervened at this time with preliminary injunctive relief, it would reverse the bargaining leverage of the parties and completely disrupt the bargaining process. The strong public interest in protecting and promoting the bargaining process merits considerable weight in the Court's analysis.

After assessing each of the *Dataphase* factors, the Court finds that the balance tips decidedly in favor of the owners and against granting a preliminary injunction. Accordingly, IT IS HEREBY ORDERED that the players' motion for a preliminary injunction is denied.

---

to consider greater compromise. Likewise, the prospect of having to live with an undesirable status quo until the matter is finally resolved at trial—which may take years—provides the players with powerful incentive to break the impasse and resume negotiations on the free agency issue.

The Court's ruling thus harmonizes the labor and antitrust laws by allowing the players' antitrust suit to move forward and at the same time protecting, and even promoting, the bargaining process.