930 F.2d 1293
 Marvin POWELL; Brian Holloway; Michael Kenn; Michael
Davis; James Lofton; Michael Luckhurst; Dan Marino;
George Martin; Steve Jordan and the National Football
League Players Association on behalf of themselves and all
class members, Appellees,
v.
NATIONAL FOOTBALL LEAGUE;* et al., Appellants.
 No. 89-5091.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 12, 1989.
Decided Nov. 1, 1989.
Rehearing and Rehearing En Banc Denied Jan. 17, 1990.
 
 Paul J. Tagliabue, Washington, D.C., for appellants.
 Carol T. Rieger, Minneapolis, Minn., for appellees.
 Before JOHN R. GIBSON, and WOLLMAN, Circuit Judges, and HEANEY, Senior Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 The National Football League appeals from a district court order which denied the League's motion for partial summary judgment, ruling that the nonstatutory labor exemption to the antitrust laws expires when, as here, the parties have reached "impasse" in negotiations following the conclusion of a collective bargaining agreement. This antitrust action was brought by Marvin Powell, eight other professional football players, and the players' collective bargaining representative, the National Football League Players Association (hereinafter the "Players").[1] Although this action also includes claims that both the League's college draft and its continued adherence to its uniform Player Contract constitute unlawful player restraints, the only League practice at issue in this interlocutory appeal is that provision of the Players' collective bargaining agreement establishing a "Right of First Refusal/Compensation" system. These employment terms restrict the ability of players to sign with other teams, a right commonly termed "free agency." On appeal, the League contends that the challenged practices are the product of bona fide, arm's-length collective bargaining and therefore are governed by federal labor law to the exclusion of challenge under the Sherman Act, 15 U.S.C. Secs. 1-7 (1982). The Players, on the other hand, argue that the labor exemption to the antitrust laws expires when parties reach "impasse" in negotiations, and that the First Refusal/Compensation system therefore may be challenged as an unlawful restraint of trade. As we conclude that this action is at present governed by federal labor law, and not antitrust law, we reverse.
 
 
 2
 In 1977, the League and the Players entered into a collective bargaining agreement containing a new system governing veteran free agent players. The First Refusal/Compensation system provided that a team could retain a veteran free agent by exercising a right of first refusal and by matching a competing club's offer. If the old team decided not to match the offer, the old team would receive compensation from the new team in the form of additional draft choices. This system was substantially modified and incorporated into a successor agreement executed in 1982, which was reached at the end of a 57-day strike.
 
 
 3
 After the 1982 Agreement expired in August, 1987, the League maintained the status quo on all mandatory subjects of bargaining covered by the Agreement, including the First Refusal/Compensation system. In September, 1987, after intermittent negotiations on a successor collective bargaining agreement proved unsuccessful, the Players initiated a strike over veteran free agency and other issues. The strike ended in mid-October, 1987, without producing a new agreement. The Players commenced this antitrust action immediately thereafter, attacking the League's continued adherence to the expired 1982 Agreement.
 
 
 4
 In late November, 1987, the Players moved for a preliminary injunction to bar the League's twenty-eight constituent football clubs, as members of a multi-employer bargaining unit, from continuing to abide by the terms of the 1982 Agreement on veteran free agent salaries and movement among clubs. The Players also moved for partial summary judgment on the issue of whether the League's continued imposition of the First Refusal/Compensation system was protected by the labor exemption to the antitrust laws, or instead violated sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. Secs. 1, 2.
 
 
 5
 On January 29, 1988, the district court held that, after expiration of a bargaining agreement, the labor exemption from the antitrust laws terminates with respect to a mandatory subject of bargaining when employers and a union reach a bargaining impasse as to the contested issue. Powell v. National Football League, 678 F.Supp. 777, 788 (D.Minn.1988) ("Powell I "). The court further stated, however, that it would not determine whether a negotiating impasse then existed between the parties until the National Labor Relations Board had passed upon a pending charge by the League asserting that the Players were not bargaining in good faith. Id. at 789. On February 1, 1988, one day after the district court filed its opinion setting forth the impasse standard, the Players advised the League that, in their view, the parties had indeed reached impasse on the free agency issue.
 
 
 6
 On April 28, 1988, the Office of the General Counsel of the National Labor Relations Board issued two Advice Memoranda declining to issue a complaint against the Players for either bad faith bargaining or failure to meet, and finding that the parties had been at impasse since October 11, 1987. This prosecutorial judgment was based on staff analysis, not on an adversarial hearing on the record. The League nevertheless withdrew its unfair labor practice charge against the Players.
 
 
 7
 The Players then renewed their motion for a preliminary injunction, contending that the district court should adopt the decision of the General Counsel of the National Labor Relations Board that impasse existed. The district court granted the Players' motion for summary judgment on June 17, 1988, holding that the parties had reached an impasse on the free agency issue as of that date. This ruling opened the doors for a trial on whether the League, in adhering to the First Refusal/Compensation system, had violated the Sherman Act's Rule of Reason. The court declined to issue a temporary injunction, however, reasoning that it lacked jurisdiction to grant injunctive relief in a labor dispute governed by the Norris-LaGuardia Act, 29 U.S.C. Secs. 105-15 (1982). Powell v. National Football League, 690 F.Supp. 812, 814-15 (D.Minn.1988) ("Powell II ").
 
 
 8
 This court granted the League permission to appeal the district court's grant of summary judgment under 28 U.S.C. Sec. 1292(b). The League argues that federal labor laws control exclusively where the challenged "restraint" relates to a mandatory subject of collective bargaining, the restraint has been developed and implemented through the lawful observance of the collective bargaining process, the employees are represented by a union vested with collective bargaining authority, and the restraint affects only a labor market involving the parties to the collective bargaining agreement. According to the League, such circumstances exist in this case and recourse to antitrust sanctions by a bargaining party such as the Players is incompatible with the purpose and operation of the federal labor laws.
 
 I.
 
 9
 This is not the first time that this court has considered whether a labor exemption shields the League from antitrust liability for the restraints it imposes on its players. In Mackey v. National Football League, 543 F.2d 606 (8th Cir.1976), cert. dismissed, 434 U.S. 801, 98 S.Ct. 28, 54 L.Ed.2d 59 (1977), the League appealed from a district court ruling that the "Rozelle Rule," a restraint on competition for player services, violated section 1 of the Sherman Act.[2] We first analyzed the statutory labor exemption to the application of the antitrust laws, observing that while the exemption applies to legitimate labor activities unilaterally undertaken by a union in furtherance of its own interest, it does not extend to concerted action or agreements between unions and nonlabor groups such as employers.[3] Id. at 611. We further held, however, that employer groups such as the League may invoke the nonstatutory labor exemption to their benefit where there has been an agreement between management and labor with regard to the challenged restraint. Id. at 612.
 
 
 10
 In Mackey, we proceeded to analyze the principles which undergird the nonstatutory labor exemption, and the determinative issue of whether relevant federal labor policy was deserving of preeminence over federal antitrust policy under the circumstances of a particular case. In resolving these competing labor and antitrust interests, we found the proper accommodation to be:
 
 
 11
 First, the labor policy favoring collective bargaining may potentially be given preeminence over the antitrust laws where the restraint on trade primarily affects only the parties to the collective bargaining relationship. * * * Second, federal labor policy is implicated sufficiently to prevail only where the agreement sought to be exempted concerns a mandatory subject of collective bargaining. * * * Finally, the policy favoring collective bargaining is furthered to the degree necessary to override the antitrust laws only where the agreement sought to be exempted is the product of bona fide arm's-length bargaining.
 
 
 12
 Id. at 614 (citations omitted).
 
 
 13
 In Mackey, we determined that the Rozelle Rule satisfied the first two of these factors but not the third. We held that the Rule affected only the parties to the labor agreements sought to be exempted from the antitrust laws, and that it constituted a subject of mandatory bargaining within the meaning of the National Labor Relations Act. Id. at 615. The district court found that the Rule, although it was later incorporated into two labor agreements, was not the product of bona fide, arm's-length bargaining, but rather was unilaterally promulgated by the League. Upon review, we concluded that the district court's finding was supported by substantial evidence. We therefore held that the labor agreements between the football clubs and their players did not qualify for the labor exemption. Id. at 615-16.
 
 
 14
 In so doing, we rejected the League's argument that the Rozelle Rule was exempt from Sherman Act scrutiny as a restraint which affected only player services and not a traditional product market. Distinguishing Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), we held that the Rule's restraints on competition within the market for player services were subject to the scrutiny of the antitrust law.[4] Mackey, 543 F.2d at 616-18.
 
 
 15
 Turning to the issue of whether the Rozelle Rule violated the Sherman Act, we rejected the district court's conclusion that the Rule was per se illegal, reasoning that the challenged restraints were not between business competitors in the traditional sense. Id. at 619. We therefore proceeded under a Rule of Reason analysis to hold that the Rozelle Rule was, for many reasons, far more restrictive than necessary to fulfill the legitimate needs of the League, and that it unreasonably restrained trade in violation of section 1 of the Sherman Act. Finally, after carefully noting the limitation of our holding,[5] we urged the League and Players to resolve problems of interteam player transfers through collective bargaining. The result was the 1977 Agreement.
 
 
 16
 The Players contend that the League in essence asks this court to overrule Mackey. The Players argue that although in the case before us the Players' collective bargaining agreement has expired, the Mackey court conditioned its application of the labor exemption upon the existence of an agreement between the union and management and specifically referred to the existence of an agreement in two of its three requirements for invoking the labor exemption. See Mackey, 543 F.2d at 614. We cannot accept this interpretation. Our discussion in Mackey was couched in terms of "agreements" because in that case we were presented with unlawful restraints which, although initiated years before football players had been represented by a union, had been incorporated by two bargaining agreements. Against those facts, we held that the mere incorporation of unlawful restraints into a collective bargaining agreement without bona fide bargaining was not sufficient to place them beyond the reach of the Sherman Act. Id. at 616.
 
 
 17
 The district court accordingly found that the present case was distinguishable from Mackey because the player restraints challenged here were the result of collective bargaining. See Powell II, 690 F.Supp. at 815 n. 7. Furthermore, Mackey itself expressly reserved the question now before us, stating that "we need not decide whether the effect of an agreement extends beyond its normal expiration date for purposes of the labor exemption." 543 F.2d at 616 n. 18. While we agree with the district court that Mackey is not controlling,[6] we feel that the analytic framework which it adopts with respect to the nonstatutory labor exemption must be employed in this case.
 
 
 18
 On appeal, the parties do not dispute that the terms of the 1977 and 1982 Agreements establishing the First Refusal/Compensation-System: (1) primarily affected only the parties in the collective bargaining relationship; (2) concerned a mandatory subject of collective bargaining; and (3) were the product of bona fide, arms'-length bargaining.[7] Under Mackey, therefore, the nonstatutory exemption precluded an antitrust challenge to those restraints while the Agreements were in effect. Now that the 1982 Agreement is terminated, however, we must decide whether the nonstatutory labor exemption has also expired or, alternatively, whether under the circumstances of this case the exemption continues to protect the League from potential antitrust liability.
 
 II.
 
 19
 The district court adopted "impasse" as the point at which the nonstatutory labor exemption expires, holding that "once the parties reach impasse concerning player restraint provisions, those provisions will lose their immunity and further imposition of those conditions may result in antitrust liability." The court reasoned that its impasse standard "respects the labor law obligation to bargain in good faith over mandatory bargaining subjects following expiration of a collective bargaining agreement," and that it "promotes the collective bargaining relationship and enhances prospects that the parties will reach compromise on the issue." Powell I, 678 F.Supp. at 789. The League attacks the district court's standard as providing a union, such as the Players, with undue motivation to generate impasse in order to pursue an antitrust suit for treble damages.
 
 
 20
 In Charles D. Bonanno Linen Service, Inc. v. NLRB, 454 U.S. 404, 102 S.Ct. 720, 70 L.Ed.2d 656 (1982), the Supreme Court defined "impasse" as:
 
 
 21
 a temporary deadlock or hiatus in negotiations "which in almost all cases is eventually broken, through either a change of mind or the application of economic force." * * * Furthermore, an impasse may be "brought about intentionally by one or both parties as a device to further, rather than destroy, the bargaining process."
 
 
 22
 Id. at 412, 102 S.Ct. at 725 (quoting Charles D. Bonanno Linen Service, Inc., 243 N.L.R.B. 1093, 1093-94 (1979)). The Supreme Court characterized impasse as a recurring feature in the bargaining process and one which is not sufficiently destructive of group bargaining to justify unilateral withdrawal. The Court agreed with the National Labor Relations Board that "permitting withdrawal at impasse would as a practical matter undermine the utility of multi-employer bargaining." Id.
 
 
 23
 The Players contend that we should accept the district court's impasse test as "inherently balanced." For support, the Players cite the language of Bridgeman v. National Basketball Association, 675 F.Supp. 960 (D.N.J.1987), which involved a challenge by professional basketball players to the National Basketball Association's college player draft, salary cap, and right of first refusal:
 
 
 24
 Impasse is certainly a plausible point at which to end the labor exemption, for by its very definition it implies a deadlock in negotiations, which could in some cases imply that the employees' consent to the restraints of the prior agreement has ended. The moment of impasse in negotiations is significant, for an employer may, after bargaining with the union to impasse, make "unilateral changes that are reasonably comprehended within his pre-impasse proposals."
 
 
 25
 Id. at 966 (footnote omitted) (quoting Taft Broadcasting Co., 163 N.L.R.B. 475, 476 (1967), aff'd sub nom. American Fed'n of Television & Radio Artists v. NLRB, 395 F.2d 622 (1968)). Bridgeman held that the labor exemption survives "only as long as the employer continues to impose that restriction unchanged, and reasonably believes that the practice or a close variant of it will be incorporated in the next collective bargaining agreement." Id. at 967. The Players argue that Bridgeman rejected the impasse test, at least in part, on a belief that the labor exemption could expire prior to impasse:
 
 
 26
 Because an impasse occurs only when the entire negotiating process has come to a standstill, the prospects for incorporating a particular practice into a collective bargaining agreement may also disappear before a full impasse in the negotiations is actually reached.
 
 
 27
 Id. The Bridgeman standard was rejected by the district court as not giving proper regard to the labor law policy promoting the collective bargaining process, in that this standard would encourage employees to exhibit steadfast, uncompromising adherence to stated terms. Powell I, 678 F.Supp. at 787. Instead, the district court suggested that its impasse standard strikes an appropriate balance between labor policy and antitrust policy:
 
 
 28
 By allowing a labor exemption to survive only until impasse, the law will not insulate a practice from antitrust scrutiny, but will only delay enforcement of the substantive law until continued negotiations over the challenged provision become pointless.
 
 
 29
 Id. at 789.
 
 
 30
 The League concedes that agreements among competing employers to impose salary or other restraints in labor markets may be subject to the Sherman Act when they are imposed outside of the collective bargaining process and without regard to the labor laws. See Mackey, 543 F.2d at 617-18 (citing cases where courts have applied the Sherman Act to restraints on competition for players' services imposed by club owners). It argues, however, that the restraints involved in cases supporting this rule were not developed in the collective bargaining process and the employment relationships in those cases were not controlled by the labor laws. The League further recognizes that the antitrust laws may apply to collectively bargained restraints when such agreements directly restrict business competition in product markets. See Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100, 421 U.S. 616, 625, 95 S.Ct. 1830, 1836, 44 L.Ed.2d 418 (1975). It further contends that product market effects are an essential predicate for applying the antitrust laws, see id. at 622, 95 S.Ct. at 1835, and that the employment terms challenged in this case do not impose any such product market restraints. In short, the League argues that in this lawsuit the Players challenge management practices wholly governed by the federal labor laws, and that the Players' sole remedy against such practices lies in the economic pressure that the Players may exert against the League under the labor laws.
 
 
 31
 Our evaluation of the district court's impasse standard cannot proceed without a firm appreciation of the remedies available under the federal labor laws to the parties involved in labor negotiations or disputes. After the expiration of a collective bargaining agreement, a comprehensive array of labor law principles govern union and employer conduct. For both sides, there is a continuing obligation to bargain. National Labor Relations Act Sec. 8(a)(5), (d), 29 U.S.C. Sec. 158(a)(5), (d) (1982); see NLRB v. Katz, 369 U.S. 736, 742-43, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962); Hinson v. NLRB, 428 F.2d 133, 139 (8th Cir.1970). Before the parties reach impasse in negotiations, employers are obligated to "maintain the status quo as to wages and working conditions." Producers Dairy Delivery Co. v. Western Conference of Teamsters Trust Fund, 654 F.2d 625, 627 (9th Cir.1981) (quoting Peerless Roofing Co. v. NLRB, 641 F.2d 734, 736 (9th Cir.1981)). Such conduct is often conducive to further collective bargaining and to stable, peaceful labor relations. Laborers Health & Welfare Trust Fund v. Advanced Lightweight Concrete Co., 484 U.S. 539, 108 S.Ct. 830, 833 n. 6, 98 L.Ed.2d 936 (1988). After impasse, an employer's continued adherence to the status quo is authorized. At the same time, once an impasse in bargaining is established, employers become entitled to implement new or different employment terms that are reasonably contemplated within the scope of their pre-impasse proposals. Id. 108 S.Ct. at 833 n. 5. If employers exceed their labor law rights in implementing employment terms at impasse, the full range of labor law rights and remedies is available to unions.
 
 
 32
 The Supreme Court has recognized that disputes over employment terms and conditions are not the central focus of the Sherman Act. For example, in holding that a union did not have standing to assert antitrust claims against a multi-employer bargaining association with which it had a collective bargaining relationship, the Court stated that Congress has developed "a separate body of labor law specifically designed to protect and encourage the organizational and representational activities of labor unions." Associated Gen. Contractors of Cal. v. California State Council of Carpenters, 459 U.S. 519, 539-40, 103 S.Ct. 897, 909, 74 L.Ed.2d 723 (1983). Under these laws, a union "will frequently not be part of the class the Sherman Act was designed to protect, especially in disputes with employers with whom it bargains." Id. at 540, 103 S.Ct. at 909. In this context, we must decide the extent to which a labor union may employ the antitrust laws to attack restraints imposed by management which are derived from an expired collective bargaining agreement.
 
 
 33
 A collective bargaining agreement is not always essential to a finding that challenged employment terms fall within the labor exemption. In Amalgamated Meat Cutters v. Wetterau Foods, 597 F.2d 133 (8th Cir.1979), employer agreements adopted in response to a strike caused plaintiffs to be denied employment. After first determining that the challenged employer conduct was lawful under the labor laws, id. at 135, this court affirmed the dismissal of plaintiffs' treble damage claims:
 
 
 34
 Since any injury to [plaintiffs] would flow naturally from the replacement of striking workers, which conduct federal labor policy sanctions, see [NLRB v. Mackay Radio & Tel. Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 (1938) ], the agreement * * * cannot constitute a violation of the antitrust law. Federal labor policy sanctions both the goal of resisting union demands and the method of replacing striking workers and the magnitude and nature of any restraint of trade or commerce in this case directly follows from the sanctioned conduct. The agreement had no anticompetitive effect unrelated to the collective bargaining negotiations.
 
 
 35
 Id. at 136.
 
 
 36
 Other courts have concluded that in certain circumstances labor market restraints imposed in a collective bargaining context do not raise Sherman Act issues. In Prepmore Apparel v. Amalgamated Clothing Workers, 431 F.2d 1004, 1007 (5th Cir.1970), cert. dismissed, 404 U.S. 801, 92 S.Ct. 21, 30 L.Ed.2d 34 (1971), the Fifth Circuit held that an employer's refusal to deal with a union with respect to terms of employment was ordinarily governed by the National Labor Relations Act and did not state a claim for violation of the Sherman Act. Similarly, in Mid-America Regional Bargaining Association v. Will County Carpenters, 675 F.2d 881, 893 (7th Cir.), cert. denied, 459 U.S. 860, 103 S.Ct. 132, 74 L.Ed.2d 114 (1982), the Seventh Circuit held that an escrow agreement which was implemented after a collective bargaining agreement expired was protected by both the statutory and nonstatutory labor exemptions. See also Richards v. Neilsen Freight Lines, 810 F.2d 898, 905 (9th Cir.1987) (noting that the nonstatutory exemption is not "limited to restraints imposed by collective bargaining agreements").
 
 
 37
 While the League invites us to read these cases as establishing a rule to the effect that the Sherman Act is concerned only with product markets and not those for player services, we need not read them so broadly. We do, however, interpret them as precedent supporting the proposition that, in certain circumstances, such as in this case, the nonstatutory labor exemption may be invoked even after a collective bargaining agreement has expired.
 
 
 38
 Our reading of the authorities leads us to conclude that the League and the Players have not yet reached the point in negotiations where it would be appropriate to permit an action under the Sherman Act. The district court's impasse standard[8] treats a lawful stage of the collective bargaining process as misconduct by defendants, and in this way conflicts with federal labor laws that establish the collective bargaining process, under the supervision of the National Labor Relations Board, as the method for resolution of labor disputes.
 
 
 39
 In particular, the federal labor laws provide the opposing parties to a labor dispute with offsetting tools, both economic and legal, through which they may seek resolution of their dispute. A union may choose to strike the employer, see, e.g., NLRB v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962), and the employer may in turn opt to lock out its employees. See, e.g., American Ship Building Co. v. NLRB, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). Further, either side may petition the National Labor Relations Board and seek, for example, a cease-and-desist order prohibiting conduct constituting an unfair labor practice. See, e.g., Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938). To now allow the Players to pursue an action for treble damages under the Sherman Act would, we conclude, improperly upset the careful balance established by Congress through the labor law.
 
 
 40
 Both relevant case law and the more persuasive commentators establish that labor law provides a comprehensive array of remedies to management and union, even after impasse. After a collective bargaining agreement has expired, an employer is under an obligation to bargain with the union before it may permissibly make any unilateral change in terms and conditions of employment which constitute mandatory subjects of collective bargaining. Hinson, 428 F.2d at 137. After impasse, an employer may make unilateral changes that are reasonably comprehended within its pre-impasse proposals. Laborers Health, 108 S.Ct. at 833 n. 5 (quoting Taft Broadcasting Co., 163 N.L.R.B. 475, 478 (1967), aff'd sub nom. American Fed'n of Television & Radio Artists v. NLRB, 395 F.2d 622 (1968)). We are influenced by those commentators who suggest that, given the array of remedies available to management and unions after impasse, a dispute such as the one before us "ought to be resolved free of intervention by the courts" where "the union has had a sufficient impact in shaping the content of the employer's offers" and where the challenged restraint is "clothed with union approval." J. Weistart & C. Lowell, The Law of Sports Sec. 5.06, at 590 (1979). In the words of Professors Berry and Gould:
 
 
 41
 A rule withdrawing immunity because the previous contract expired before a new agreement was reached is contrary to national labor law. The parties would be forced to enter into a collective bargaining agreement to avoid antitrust sactions, when labor law is opposed to any such requirement. On the other hand, the employer cannot alter its stance subsequent to an impasse in negotiations and unilaterally impose a package different from that which has been on the bargaining table. Such action would be a refusal to bargain and an unfair labor practice by the employer.
 
 
 42
 * * * * * *
 
 
 43
 What seems appropriate is that the employer's position emerged from the collective bargaining process. Good faith bargaining must occur, even to the point of impasse, regardless of the lack of substantive influence of the union's proposals in the negotiations. If an impasse occurs and the employer's unilateral terms were offered to the union, the employer should be deemed not to have violated any labor law.
 
 
 44
 Berry & Gould, A Long Deep Drive to Collective Bargaining: Of Players, Owners, Brawls, and Strikes, 31 Case W.Res.L.Rev. 685, 774 (1981). And as Judge Winter has said, "no one seriously contends that the antitrust laws may be used to subvert fundamental principles of our federal labor policy as set out in the National Labor Relations Act." Wood v. National Basketball Ass'n, 809 F.2d 954, 959 (2d Cir.1987). To allow the claim here asserted by the Players would, we conclude, be inconsistent with federal labor policy.[9] See generally Jacobs & Winter, Antitrust Principles and Collective Bargaining by Athletes: Of Superstars in Peonage, 81 Yale L.J. 1 (1971).
 
 
 45
 The labor arena is one with well established rules which are intended to foster negotiated settlements rather than intervention by the courts. The League and the Players have accepted this "level playing field" as the basis for their often tempestuous relationship, and we believe that there is substantial justification for requiring the parties to continue to fight on it, so that bargaining and the exertion of economic force may be used to bring about legitimate compromise.
 
 
 46
 The First Refusal/Compensation system, a mandatory subject of collective bargaining, was twice set forth in collective bargaining agreements negotiated in good faith and at arm's-length. Following the expiration of the 1982 Agreement, the challenged restraints were imposed by the League only after they had been forwarded in negotiations and subsequently rejected by the Players.[10] The Players do not contend that these proposals were put forward by the League in bad faith. We therefore hold that the present lawsuit cannot be maintained under the Sherman Act. Importantly, this does not entail that once a union and management enter into collective bargaining, management is forever exempt from the antitrust laws, and we do not hold that restraints on player services can never offend the Sherman Act. We believe, however, that the nonstatutory labor exemption protects agreements conceived in an ongoing collective bargaining relationship from challenges under the antitrust laws.[11] "[N]ational labor policy should sometimes override antitrust policy," Continental Maritime of San Francisco v. Pacific Coast Metal Trades Dist. Council, 817 F.2d 1391, 1393 (9th Cir.1987) (citing Connell Constr., 421 U.S. at 622, 95 S.Ct. at 1835), and we believe that this case presents just such an occasion.[12]
 
 
 47
 Upon the facts currently presented by this case, we are not compelled to look into the future and pick a termination point for the labor exemption. The parties are now faced with several choices. They may bargain further, which we would strongly urge that they do. They may resort to economic force. And finally, if appropriate issues arise, they may present claims to the National Labor Relations Board. We are satisfied that as long as there is a possibility that proceedings may be commenced before the Board, or until final resolution of Board proceedings and appeals therefrom, the labor relationship continues and the labor exemption applies.[13] Since the matter before us concerns an interlocutory appeal, we need not decide issues left unresolved by this opinion.
 
 III.
 
 48
 In sum, we hold that the antitrust laws are inapplicable under the circumstances of this case as the nonstatutory labor exemption extends beyond impasse. We reverse the order of the district court and remand the case with instructions to enter judgment in defendants' favor on Counts I, II, and VIII of plaintiffs' amended complaint.
 
 
 49
 HEANEY, Senior Circuit Judge, dissenting.
 
 
 50
 Today, the majority permits the owners to violate the antitrust laws indefinitely. Because such a result is not justified by the labor laws, I dissent.
 
 
 51
 After carefully reviewing the record and the briefs, it seems clear to me that we improvidently granted the owners permission to file an interlocutory appeal. The owners conceded at oral argument that the district court has yet to determine whether the parties have reached an impasse on the college draft issue.[1] Because the college draft is an essential element of the package of player restraints, it is difficult to understand how either the district court or this Court can determine whether an impasse has, in fact, been reached on the important question of player restraints.[2]
 
 
 52
 Moreover, the interests of justice will be served if we permit the district court to try the case and to reach a decision on the question of whether the player restraints, considered collectively, violate the antitrust laws under the rule of reason.[3] If an appeal then were taken, we would have a complete record. It is also likely that the parties will resolve all contractual disputes during the course of the litigation, a result that should be encouraged. As long as both parties are uncertain about the ultimate result, they are apt to find it in their mutual interest to agree rather than to have a decision imposed on them by the court. There is no reason why the case cannot be fully heard and decided by the district court before the 1990-91 NFL football season opens.
 
 
 53
 Because, and only because, the majority reverses the district court and holds that the nonstatutory labor exemption to the antitrust laws does not expire at impasse, do I state my agreement with the district court that the exemption ends when the parties have reached an impasse in negotiations.[4]
 
 
 54
 The district court's opinion is well reasoned and fully consistent with this Court's holding in Mackey v. National Football League, 543 F.2d 606 (8th Cir.1976). In Mackey, we held that only those collective bargaining agreements which are the products of bona fide arm's length bargaining are immune from the application of the antitrust laws. While Mackey left open the question of when the labor exemption expires, the clear implication of that case is that the exemption should protect illegal restraints only as long as such restraints are part of bona fide collective bargaining. Mackey, 543 F.2d at 614 ("the policy favoring collective bargaining is furthered to the degree necessary to override the antitrust laws only where the agreement sought to be exempted is the product of bona fide arm's length bargaining") (emphasis added).[5] The logic of Mackey as applied to this case is clear. The labor exemption will not immunize restraints which are unilaterally continued after impasse because such restraints are not agreed to during good faith bargaining. Similarly, new restraints, unilaterally implemented, are not protected by the labor exemption. Union approval is a prerequisite to the application or continuation of the exemption.
 
 
 55
 The majority purports to reject the owners' argument that the labor exemption in this case continues indefinitely. The practical effect of the majority's opinion, however, is just that--because the labor exemption will continue until the bargaining relationship is terminated either by a NLRB decertification proceeding or by abandonment of bargaining rights by the union.
 
 
 56
 The majority asserts that the players can seek a cease and desist order from the NLRB to prohibit conduct constituting an unfair labor practice. Implicit in this assertion is the idea that it may be an unfair labor practice for employers to insist on a package of player restraints which violate the antitrust laws. The problem is that the NLRB will not decide that question. The NLRB will say that it is for the courts to decide whether the antitrust laws are being violated. We should accept our responsibility and direct the district court to make that determination.[6]
 
 
 57
 The only basis for NLRB action thus would appear to be a petition for decertification. Certainly, the owners will not file such a petition knowing full well that, if they do, they will subject themselves to antitrust scrutiny. Certainly, the Union will not file such a petition when the price will be the loss of collective bargaining rights. The only likely source for a petition to decertify is a group of high-salaried, highly skilled players who believe that they could do better without a union.[7] It follows that the end result of the majority opinion is that once a union agrees to a package of player restraints, it will be bound to that package forever unless the union forfeits its bargaining rights. Certainly, Mackey does not suggest such a result.
 
 
 58
 The majority also suggests that the union can strike to eliminate or modify the player restraints. This is, of course, an alternative, but should players be forced to strike to alter owner conduct which violates the antitrust laws? I think not.[8]
 
 
 59
 Neither scenario, decertification nor economic strife, harmonizes the antitrust laws with the labor laws. See Mackey, 543 F.2d at 613-14 ("Although the cases giving rise to the nonstatutory exemption are factually dissimilar from the present case, certain principles can be deduced from those decisions governing the proper accommodation of the competing labor and antitrust interests involved here.") (footnotes omitted).
 
 
 60
 The majority opinion will, moreover, discourage collective bargaining. Players will be considerably less likely to enter into any agreement with respect to player restraints because of the certainty that the terms of the agreement will become the terms of employment ad infinitum, unless they strike and win. See National Labor Relations Act Sec. 1, 29 U.S.C. Sec. 151 ("experience has proved that protection by law of the right of employees to organize and bargain collectively ... promotes the flow of commerce ... by encouraging practices fundamentally to the friendly adjustment of industrial disputes").
 
 
 61
 In practical terms the majority has eliminated the owners' fear of the antitrust lever; therefore, little incentive exists for the owners to ameliorate anticompetitive behavior damaging to the players. See National Labor Relations Act Sec. 1, 29 U.S.C. Sec. 151 (the NLRA is aimed at promoting "actual liberty of contract" by redressing the unequal balance of bargaining power between employers and employees); Norris-LaGuardia Act Sec. 2, 29 U.S.C. Sec. 102 (the Norris-LaGuardia Act is aimed at redressing the unequal balance of bargaining power between employers and employees); see also NLRB v. Insurance Agents Int'l Union, 361 U.S. 477, 506-07, 80 S.Ct. 419, 436, 4 L.Ed.2d 454 (1960) (Frankfurter, J., separate opinion) ("main purpose of the Wagner Act was to put the force of law behind the promotion of unionism as the legitimate and necessary instrument 'to give laborers opportunity to deal on equality with their employer' ") (citation omitted).
 
 
 62
 To argue that continuing the exemption beyond impasse is conducive to a stable bargaining environment and judicial nonintervention, as the majority has done, is untenable. See Lock, The Scope of the Labor Exemption in Professional Sports, 1989 Duke L.J. (forthcoming). Rather, the majority's view undercuts the labor law principles of freedom to contract and the promotion of bona fide, arm's length negotiations. Under the majority's rule, an agreement to a particular restraint for a finite period of time operates to waive, indefinitely or permanently, a union's right to challenge that restraint after the expiration of the agreement under the antitrust laws. The ultimate result is that the majority has intervened to remove the players' rights under the antitrust laws from the bargaining table and has unjustifiably given the owners a continuing right to circumvent the antitrust laws.[9]
 
 
 63
 It may be argued that both successful and unsuccessful strikes and lockouts are normal parts of the collective bargaining process and that this Court should not give the players through court action what they are unable to win at the bargaining table or through economic action. I subscribe to that view, but this view cannot be controlling where the employers are engaging in practices which may well be illegal. There must be a point at which the validity of the package of player restraints can be tested without the union resorting to a strike or terminating its collective bargaining rights. In my view, impasse is the appropriate point at which to do this.
 
 
 64
 LAY, Chief Judge, with whom McMILLIAN, Circuit Judge, joins, dissenting.
 
 
 65
 I dissent from this court's denial of rehearing en banc. This case is undoubtedly one of the more significant cases this court has confronted in several years. A 2-1 panel opinion now serves as an important precedent of newly-declared law in the accommodation of congressional policies favoring both free competition and collective bargaining. In all due respect, two judges of this court have impliedly overruled this court's long-standing, well-recognized precedent in Mackey v. National Football League, 543 F.2d 606 (8th Cir.1976). In doing so, the panel majority concedes its own uncertainty as to when the antitrust exemption ends, and, in addition, needlessly treats the issue as ripe for resolution.[1]
 
 
 66
 En banc procedures should seldom be invoked. In recent years I have been critical of this court using en banc procedures to hear routine and insignificant issues. See, e.g., United States v. Arpan, 887 F.2d 873, 879 n. 2 (8th Cir.1989) (en banc) (Lay, C.J., dissenting) (issue of trial judge's response to juror question). En banc procedures expend valuable judicial energies which should be used not to correct questionable panel decisions but only to decide decisions of the utmost importance or to resolve intra-circuit conflicts. See Western Pac. R.R. Corp. v. Western Pac. R.R., 345 U.S. 247, 260-62, 73 S.Ct. 656, 662-64, 97 L.Ed. 986 (1953). Here, not only is the issue significant, but the panel has impliedly overruled a long-standing decision of this court. Thus, in my judgment, this case is among the rare exceptions which should be reheard en banc.
 
 
 67
 This court's Mackey decision, which I authored in 1976 and which then Chief Judge Floyd Gibson and Judge William Webster joined, declared "the policy favoring collective bargaining is furthered to the degree necessary to override the antitrust laws only where the agreement sought to be exempted is the product of bona fide arm's length bargaining." Id. at 614 (emphasis added). Mackey is founded on the principles that an employer's exemption owes its existence to union consent, and is aimed at preserving the integrity of the negotiating process. As stated by the Third Circuit in Scooper Dooper, Inc. v. Kraftco Corp., 494 F.2d 840, 847 n. 14 (3d Cir.1974):
 
 
 68
 We reject Scooper Dooper's contention that the labor exemption is unavailable to employers. Such a proposition would undermine the vitality of the exemption by discouraging bargaining on the part of management. To preserve the integrity of the negotiating process, employers who bargain in good faith must be entitled to claim the antitrust exemption. (citation omitted)
 
 
 69
 The panel majority purports to apply Mackey, yet ignores these principles. The undeniable reality is that the panel opinion does not apply Mackey, it rejects it by destroying its carefully constructed limitations.
 
 
 70
 The panel majority notes that Mackey left open the question whether the exemption continues after a bona fide agreement formally terminates.[2] However, the panel then proceeds to extend the law based on a premise which completely ignores the rationale of Mackey. In the present case the collective bargaining agreement containing the exempted restraint has not only come to an end, but, under the panel majority's erroneous assumption, the parties have unsuccessfully bargained over its continuance to the point of impasse. Clearly, at this point the restraint can no longer be considered "the product of bona fide arm's-length negotiation." Once impasse has been reached, after termination of an agreement, it is a complete nonsequitur to hold that continued restraints are protected as an accommodation of the good faith bargaining of the parties.
 
 
 71
 The panel decision destroys the very foundation of the limits we carefully constructed in Mackey. The panel majority reasons that, notwithstanding impasse, as long as the restraint was at one time contained within a terminated agreement it retains immunity as the "product" of collective bargaining. Surely this cannot be the law. If the exemption does not end at impasse, when does it end? The majority's view does not accommodate labor policy, it instead offers an employer's Shangri-la of everlasting immunity from the antitrust laws.
 
 
 72
 The holding in Mackey was focused on "the proper accommodation of the competing labor and antitrust interests * * *." 543 F.2d at 614. We based our analysis on the Supreme Court's requirement that "a proper accommodation between the congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in business markets requires that some union-employer agreements be accorded a limited nonstatutory exemption from antitrust sanctions." Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100, 421 U.S. 616, 622, 95 S.Ct. 1830, 1835, 44 L.Ed.2d 418 (1975) (emphasis added). Mackey did not rely solely on the existence of an agreement. Rather it turned on whether the restraints were obtained through the bona fide collective bargaining process. We held that the exemption was not available, notwithstanding the Rozelle Rule's incorporation into earlier agreements,[3] because the club owners had refused to bargain in good faith over the Rozell Rule. Mackey, 543 F.2d at 613, 616. Here there can be no question but that once the contract ended and an impasse in attempting to negotiate further restraints on player's services was reached, the exemption no longer was effective because the bona fide bargaining process had ceased. Assuming impasse, both sides are free to act unilaterally.[4] At this point, the restraint is no longer a product of collective bargaining; it is simply a unilateral rule imposed by management. To hold otherwise undermines basic, rudimentary labor policy and law.
 
 
 73
 The rationale underlying the panel decision appears to be that a union should not be entitled to invoke the antitrust laws to gain something it could not win at the bargaining table. This overlooks the fact that the restraint involved is clearly beneficial to management, and is illegal unless otherwise exempt. The panel majority fails to comprehend that it was not the union that failed to win a concession, but the employer who gained victory in the first instance by obtaining the antitrust exemption through union consent.
 
 
 74
 The only labor policy of which I am aware that is accommodated by exempting the laws protective of free competition is bona fide collective bargaining. Yet, this court's unprecedented decision leads to the ineluctable result of union decertification in order to invoke rights to which the players are clearly entitled under the antitrust laws. See Powell, see p. 1304 (Heaney, J., dissenting). The plain and simple truth of the matter is that the union should not be compelled, short of self-destruction, to accept illegal restraints it deems undesirable. Union decertification is hardly a worthy goal to pursue in balancing labor policy with the antitrust laws.
 
 
 75
 The panel decision, left undisturbed by the failure of the en banc court to rehear the case today, not only fails to adhere to our precedent in Mackey, but substantially amends the antitrust laws. In doing so, it ignores the Supreme Court's admonition that "exemptions from antitrust laws are to be narrowly construed." Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 231, 99 S.Ct. 1067, 1083, 59 L.Ed.2d 261 (1979). For these reasons, I would grant petitioner's suggestion for rehearing en banc, and would vote to overturn the panel opinion.
 
 
 76
 JOHN R. GIBSON, Circuit Judge, concurring in the denial of the rehearing en banc, joined by WOLLMAN, Circuit Judge.
 
 
 77
 As the authoring judge of the court's opinion this case, I feel compelled to make a brief response to the dissent to denial of rehearing en banc. The dissent to denial argues that there is in fact no impasse and that the panel opinion is dicta. The issue is not so simple as the dissent to denial would make it. The district court in the decision on appeal, ruled that the termination of the labor exemption expired when the parties reach impasse "as to that issue," and in a later order held that there had been impasse as to the free agency issue. Neither of the parties have challenged the district court's holding that there was impasse. That issue was not before the court for decision. Insofar as this decision contained factual elements, there was no claim made that it was clearly erroneous. The dissent to the panel opinion makes no such suggestion, but only observes that the dissenting judge would not have found impasse had he been the original fact-finder. The footnote to the panel dissent then expands upon the issue demonstrating that there is a division between NLRB decisions as to the divisibility or indivisibility of impasse. These legal issues were likewise not the subject of briefing or argument before the court. Accordingly, the district court holding that there was impasse as to the specific issue was part of the factual and procedural pattern presented to this court framing the issue to decide. It would have been improper to have decided flatly that there was no impasse, but the dissent to denial would take this quantum leap and place the case in a different posture.
 
 
 78
 Little is to be gained by further response to the dissent to denial. Seven judges of the court have declined to rehear, and the case should simply be left at that point.
 
 
 
 *
 Opinion originally published at 888 F.2d 559
 
 
 [1]
 Powell is president of the National Football League Players Association. Brian Holloway, Michael Kenn, Michael Davis, James Lofton, Michael Luckhurst, Dan Marino, George Martin, and Steve Jordan are present or former officials of the Players Association
 
 
 [2]
 "The Rozelle Rule essentially provides that when a player's contractual obligation to a team expires and he signs with a different club, the signing club must provide compensation to the player's former team. If the two clubs are unable to conclude mutually satisfactory arrangements, the Commissioner may award compensation in the form of one or more players and/or draft choices as he deems fair and equitable." Mackey, 543 F.2d at 609 n. 1
 
 
 [3]
 Mackey observed that the basic sources of the exemption were sections 6 and 20 of the Clayton Act, 15 U.S.C. Sec. 17 and 29 U.S.C. Sec. 52, and the Norris-LaGuardia Act, 29 U.S.C. Secs. 104, 105, and 113. Mackey, 543 F.2d at 611
 
 
 [4]
 The Supreme Court in Apex stated:
 [I]t would seem plain that restraints on the sale of the employee's services to the employer, however much they curtail the competition among employees, are not in themselves combinations or conspiracies in restraint of trade or commerce under the Sherman Act.
 310 U.S. at 503, 60 S.Ct. at 997. In Mackey we acknowledged that this language seemingly supported the League's defense that a restriction on competition for player services was not the type of restraint proscribed by the Sherman Act. 543 F.2d at 616-17. We nevertheless distinguished Apex on the grounds that in that case the Supreme Court condoned restrictions on competition for employee services imposed by the employees themselves, not by the employers. Id. at 617.
 
 
 [5]
 We stated:
 We note that our disposition of the antitrust issue does not mean that every restraint on competition for players' services would necessarily violate the antitrust laws. Also, since the Rozelle Rule, as implemented, concerns a mandatory subject of collective bargaining, any agreement as to inter-team compensation for free agents moving to other teams, reached through good faith collective bargaining, might very well be immune from antitrust liability under the nonstatutory labor exemption.
 Mackey, 543 F.2d at 623.
 
 
 [6]
 We differ with the dissent's argument that the logic of Mackey applied to this case would end the labor exemption at impasse. We believe its language referring to the "agreement sought to be exempted," 543 F.2d at 614, applies to the "product of bona fide arm's-length bargaining," id., before termination and continues afterward, whether to impasse or to some other point in time
 
 
 [7]
 Indeed, in Reynolds v. National Football League, 584 F.2d 280 (8th Cir.1978), we affirmed the district court's approval of a settlement in a class action by which the Players challenged the 1977 Agreement and its "First Refusal/Compensation" system, stating that it was "a near certainty that the collective bargaining agreement was the result of 'bona fide arms-length negotiations.' " Id. at 288
 
 
 [8]
 As the dissent suggests, there may well be no impasse at this time. The district court carefully defined its determination as to impasse as to the single issue of player restraint provisions, even though, as the dissent points out, negotiations continue as to other issues
 
 
 [9]
 The dissent assumes that the contractually created "Right of First Refusal/Compensation" system is a violation of the antitrust law. This contractual provision was spawned in collective bargaining, and as it is the product of a labor relationship, we cannot agree that it should be considered a violation of antitrust laws
 
 
 [10]
 On November 17, 1988, the League delivered two proposals to the Players. The first of these modified player benefits but maintained the First Refusal/Compensation system for all players, and strongly resembled a management proposal of September 7, 1987, that the players had rejected before striking. The second proposal, which offered free agency to some players but retained the First Refusal/Compensation system for many others, was similar to a management proposal offered to the Players in September and October of 1987. After the Players had rejected both proposals, the League implemented a new "free agency" system effective February 1, 1989, which was substantially identical to the terms of the second proposal
 
 
 [11]
 The dissent argues that the court's action today deprives the union of the threat of antitrust laws, "the antitrust lever" and removes this issue from the bargaining table. This is precisely the thrust of the nonstatutory labor exemption to the antitrust laws
 
 
 [12]
 The League concedes that the Sherman Act could be found applicable, depending on the circumstances, if a challenged restraint related to a permissive rather than a mandatory subject of bargaining; if the restraint had been imposed on employees outside the collective bargaining process or had not originally been proposed in good faith; or if the affected employees ceased to be represented by a certified union. None of these circumstances are presented by this case
 
 
 [13]
 The dissent places great stress on Professor Lock's article, The Scope of the Labor Exemption in Professional Sports, 1989 Duke L.J. 339. Much of Lock's reasoning is based upon the "significant mismatch in relative bargaining positions" and, in addition to the labor exemption, addresses other issues, such as television revenues and restriction on movement of franchises as well as repeal of existing antitrust exemptions. As a court, we have a limited issue before us as to the temporal extent of the nonstatutory labor exemption. We acknowledge the many policy issues that exist in the League/Players dispute that may be addressed by Congress but not by us. Interestingly, while not in the record before us, Professor Lock states that television revenues now exceed gate revenues which possibly may explain the dissent's reference to the change in percentage of gross revenues that player salaries represent
 
 
 [1]
 The following colloquy occurred at oral argument:
 THE COURT: And as to the college draft issue, Judge Doty has made a specific finding that there was no impasse; is that correct?
 COUNSEL FOR OWNERS: He has not addressed that question yet * * * and that issue is not before the court on this certification.
 
 
 [2]
 Had I been the original factfinder, I would not have found impasse. Not only is the college draft issue still open, but it appears that the parties continue to meet on grievances, drug testing, and other matters of importance. See Henry Miller Spring Co., 273 NLRB 472, 472 (1984) (no impasse where parties are still negotiating over significant issues). The NLRB, however, found the question of free agency to be an issue of such overriding importance that no agreement could be reached as long as there was disagreement on that issue. NFL Players Association, No. 2-CB-12117 (as amended), Advice Memo. at 7-8 (Apr. 28, 1988). The NLRB thus found impasse. See Bell Transit Co., 271 NLRB 1272, 1273 (1984) (impasse in negotiations exists if impasse exists on issues of supreme importance); E.I. DuPont & Co., 268 NLRB 1075, 1076 (1984) (impasse in negotiations if impasse exists on issue of overriding importance). Neither party asked for a review of that decision. The district court relied on the NLRB's decision to find impasse
 
 
 [3]
 Player restraints agreed to by the owners and the players in the 1982 collective bargaining agreement did not provide an opportunity for players to become free agents. In the five years during which the 1982 agreement was in effect, only one player received an offer from another club. Under the restraint package initiated unilaterally by the owners in February 1989, after the NLRB found that an impasse had occurred in negotiations, each club was permitted to protect 37 players. Thus, none of the top 37 players on each team has had the opportunity to become a free agent and establish his worth in the open market. The remaining 619 players were unprotected and able to enter into the free agency market. Of that number, 229 were signed by other teams. Of the 229, 149 were under contract with an NFL team as of the start of this season. For a discussion of the application of the antitrust laws to professional football and other sports, see Monopoly Sports Leagues, 73 Minn.L.Rev. 643 (1989)
 
 
 [4]
 I favor the impasse test even though a persuasive argument can be made for ending the exemption at the expiration of the collective bargaining agreement. See Lock, The Scope of the Labor Exemption in Professional Sports, 1989 Duke L.J. (forthcoming). The author concludes that the expiration of the collective bargaining agreement is the only endpoint that promotes collective bargaining and labor law principles without subverting federal antitrust policy
 The test adopted in Bridgeman v. NBA, 675 F.Supp. 960 (D.N.J.1987), that the labor exemption survives only as long as the employer continues to impose the restriction in question unchanged and reasonably believes that the practice or some variant will be incorporated in the next agreement, is impractical, permits the labor laws to trump the antitrust laws without any labor law justification, and is inconsistent with Mackey in much the same manner as the majority's test.
 
 
 [5]
 This view of Mackey is also consistent with Supreme Court decisions addressing the scope of the labor exemption. See, e.g., Connell Constr. Co. v. Plumbers & Steamfitters Local 100, 421 U.S. 616, 621-22, 95 S.Ct. 1830, 1834-35, 44 L.Ed.2d 418 (1975) ("nonstatutory exemption has its source in strong labor policy favoring the association of employees to eliminate competition over wages and working conditions"); Amalgamated Meat Cutters v. Jewel Tea Co., 381 U.S. 676, 689, 85 S.Ct. 1596, 1601, 14 L.Ed.2d 640 (1965) ("exemption for union-employer agreements is very much a matter of accommodating the coverage of the Sherman Act to the policy of the labor laws")
 
 
 [6]
 I find no support in Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938), for the majority's position. In that case, the United Electrical Workers contended that Consolidated Edison was interfering with the right of Consolidated's employees to form, join, or assist labor organizations of their own choosing and were contributing financial and other support to the International Brotherhood of Electrical Workers. The NLRB found that the company had violated sections 8(a)(1), (2) and (3) of the National Labor Relations Act, 29 U.S.C. Secs. 158(a)(1), (2) and (3). It entered an order designed to correct the effects of the unfair labor practices, including an order for the company to cease and desist giving effect to a contract that had been entered into by Consolidated and the International Brotherhood of Electrical Workers. The Supreme Court concluded that the NLRB was without authority to enter the cease and desist order because the NLRB neither alleged nor proved that those persons who joined the International Brotherhood of Electrical Workers did so because of the unfair labor practices. Thus, it reasoned that a majority of the employees may well have approved the collective bargaining agreement. Try as I may, I am unable to see how that case is relevant to the matter at hand
 
 
 [7]
 A judicial determination that challenged restraints are exempt from the antitrust laws by virtue of the union's existence might induce the players to decertify the union. Lock, The Scope of the Labor Exemption in Professional Sports, 1989 Duke L.J. (forthcoming)
 
 
 [8]
 See Lock, The Scope of the Labor Exemption in Professional Sports, 1989 Duke L.J. (forthcoming). Lock notes that there are several features that distinguish the professional athletes' unions from the great majority of industrial unions. First, professional athletes do not possess homogeneous skills; a wide range of ability and expertise exists among players. Thus, different players have dramatically different needs from a union. Second, the nature of professional sports presumes that the owners retain nearly complete discretion to make necessary personnel changes to produce a winning team. Typically, a professional athlete has virtually no job security. For example, the NFL standard player contract contains no injury protection beyond the season in which the injury occurs and grants the team sole discretion to terminate a player's contract at any time for lack of skill. Only five percent of all NFL players have been able individually to limit this discretion. In addition, the professional life of an athlete is short, resulting in high turnover of union members. The NFL Players Association experiences an average yearly turnover of twenty-five percent. Thus, a strike jeopardizes a significant portion of the career and earning potential of many athletes. Moreover, most professional athletes possess highly specialized skills that are rarely marketable in any other industry. As a result, players are extremely vulnerable to explicit and implicit management pressure
 
 
 [9]
 In 1961, Congress passed legislation permitting the NFL to sell its television rights in a package and to allocate the revenues on a pro rata basis, thus authorizing what otherwise would have been a clear violation of the antitrust laws
 In 1966, Congress enacted legislation sanctioning the merger between the NFL and the AFL, a merger which otherwise would have violated the antitrust laws.
 Each of these actions by Congress weakened the players and their unions in the collective bargaining process vis-a-vis the owners. In 1966, when the AFL was a bona fide competitor of the NFL, salaries accounted for 67% of gross revenues. In the years following the merger, the percentage decreased. In 1972, the percentage was 42%. In 1980, salaries accounted for 30% of league revenues. Certainly, the courts should not tilt the scales further in favor of the owners by permanently legalizing violations of the antitrust laws.
 
 
 [1]
 I base my views regarding the panel majority's misinterpretation of Mackey only upon the majority's apparent but wrongful assumption that impasse between the union and the owners has been reached
 I agree with Judge Heaney that the district court should not have found impasse on the single issue of the free agency rule. See Powell v. National Football League, see p. 1304 (Heaney, J., dissenting). The parties are still negotiating over other terms of the contract. Impasse on overall negotiations of the contract has not been reached by the parties and therefore summary judgment is not ripe at this time. The parties may yet settle all their disputes in one agreement. The finding of impasse, prematurely acquiesced in by the panel majority, overlooks the fact that in 1976 the owners argued a "quid pro quo" existed for the adoption of the Rozelle Rule in the fact that the players received increased pension rights and the right to negotiate their own contracts. See Mackey, 543 F.2d at 616. Such an argument illustrates that labor negotiations involve a give and take on many varied issues. It is impractical to reach sound legal decisions on a bifurcated bargaining subject when other subjects which are inherently intertwined are still pending negotiation.
 The panel majority seemingly agrees that no impasse has been reached. See Powell, panel op. p. 1302 n. 8. If the panel majority had stopped there, I would have no disagreement. The suit could be dismissed on the ground that bargaining on all subjects, including the free agency rule, continues. But the panel majority goes on and rules, in an unprecedented decision, that the exemption continues beyond a hypothetical impasse. Thus, the panel majority opinion is pure dicta.
 
 
 [2]
 In Mackey, we did not need to decide whether the effect of an agreement might extend beyond its formal expiration date for purposes of the labor exemption. Mackey, 543 F.2d at 616 n. 18. We expressly acknowledged the issue, however, in recognition of conflicting statutory obligations that might arise given cases requiring an employer to adhere to contract terms after the contract's formal expiration date while the parties continue their bargaining for a new contract. See, e.g., Hinson v. NLRB, 428 F.2d 133, 139 (8th Cir.1970). This duty to maintain the status quo, however, ends at the point impasse is reached. At that point, the slate is essentially wiped clean, and the employer is free to unilaterally implement proposals which the union may have strongly opposed at the bargaining table
 
 
 [3]
 The earlier agreements in Mackey containing the restraints even contained a "zipper" clause which read: "[T]his Agreement represents a complete and final understanding on all bargainable subjects of negotiation among the parties during the term of this Agreement * * *." 543 F.2d 613
 
 
 [4]
 This is true of course as long as the unilateral action adheres to recognized legal restraints governing the parties' conduct. One such legal restraint would certainly be the antitrust laws